# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **BRADLEY ERWIN EASTERLY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:20-cv-00065** |
| | ) | |
| **KNOX COUNTY, et al.** | ) | **JRG/HBG** |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

**NOW COMES** the Plaintiff, Bradley Erwin Easterly ("Plaintiff"), by leave of Court, and files this Amended Complaint against the Defendants, Knox County, Tennessee, a governmental entity ("County"); Lieutenant Josh Smith, individually ("Lt. Smith"); Lieutenant Seth Miller, individually ("Lt. Miller"); Officer Adam Backer, individually ("Officer Bakker"); Officer Lance Thomas, individually ("Officer Thomas"); Officer Kris Thornbury, individually ("Officer Thornbury") (collectively, "Defendants").

Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: (865) 200-4117
lance@lbakerlawfirm.com

Joshua D. Hedrick, Esq.
**WHITT, COOPER, HEDRICK**
  **& WOJCIK**
607 Market Street, Suite 1100
Knoxville, TN 37902
Tel: (865) 518-7073
hedrick@knoxdefense.com

# TABLE OF CONTENTS

I.     NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

       A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

       B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

IV.    FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

       A.    Officer Thornbury Violently Jerks Plaintiff Off of His Bunk and
             Hits Him With His Knee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

       B.    Strip-Searched, Tased, Punched, and Groped by as Many as Eight
             Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

       C.    Holding Plaintiff Face-down on the Floor; Unable to Breathe . . . . . .  17

       D.    Begging for Someone to Help Him; Choking; Still Unable to
             Breathe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

       E.    Pepper-spayed or Maced in the Face; Masked . . . . . . . . . . . . . . . . . .  19

       F.    Placed in Five-Point Restraints in Restraint Chair for Hours . . . . . .  19

       G.    Lt. Miller's *Quid Pro Quo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

       H.    The Unreasonable Punishment Continues . . . . . . . . . . . . . . . . . . . . . .  21

V.     WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

VI.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

       COUNT ONE – EXCESSIVE FORCE – Violation of Civil Rights under
       Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth
       Amendments (Against Officer Thornbury, Individually) . . . . . . . . . . . . . . .  23

COUNT TWO – EXCESSIVE FORCE – Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth Amendments (Against Lt. Smith, Officer Thomas, and Officer Bakker, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

COUNT THREE – EXCESSIVE FORCE – Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth Amendments (Against Lt. Miller, Individually) . . . . . . . . . . . . . . . . . . . . . . 29

COUNT FOUR – RIGHT TO PRIVACY – Violation of Civil Rights under Color of Law,
42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments (Against Lt. Smith, Individually, and Officers Bakker and Thomas, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

COUNT FIVE – FAILURE TO TRAIN AND SUPERVISE – Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988 under Fourth, Eighth, and Fourteenth Amendments (Against the County) . . . . . 36

COUNT SIX – FAILURE TO TRAIN AND SUPERVISE – FOURTH AMENDMENT PRIVACY VIOLATION – Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments (Against the County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

COUNT SEVEN – BATTERY (Against the County, Lt. Smith, Individually, and Officers Bakker, Thomas, and Thornbury, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

COUNT EIGHT – COMMON LAW INVASION OF PRIVACY (Against the County, Lt. Smith, Officer Bakker, and Officer Thomas, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

COUNT NINE – NEGLIGENCE (Against the County and All Individual Defendants, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COUNT TEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against All Individual Defendants, Individually) . . . . . . . . . . 49

VII.     JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

VIII.    PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

-iii-

## I. NATURE OF ACTION

1. On March 14, 2019, Bradley Easterly ("Mr. Easterly" or "Plaintiff") was sleeping on the top bunk of his cell at the Roger D. Wilson Detention Facility in Knoxville, Tennessee. In what would be the worst day of his life, Mr. Easterly was startled awake by Knox County Corrections Officer Kris Thornbury ("Officer Thornbury") banging on his cell ordering Mr. Easterly's cell-mate to get out with his stomach on the floor. Officer Thornbury next yelled for Mr. Easterly to get on his stomach on the floor. Before Mr. Easterly could even get out from under his blanket, Officer Thornbury grabbed him by the arm and violently jerked him out of the bunk, banging his head so hard Mr. Easterly was dazed and in pain. Moments later, as Mr. Easterly was on his stomach on the ground, Officer Thornbury put his knee on Plaintiff's lower back and pushed down with all his weight.

2. Officer Thornbury escorted Mr. Easterly to the medical unit, where Lt. Josh Smith ("Lt. Smith"), Officer Adam Bakker ("Officer Bakker"), Officer Lance Thomas ("Officer Thomas"), and Officer Brandon Hemphill ("Officer Hemphill") waited for him. After ordering Mr. Easterly to face a table up against a wall, Lt. Smith jerked Mr. Easterly's pants and underwear down to his ankles. By then, Mr. Easterly was completely naked, standing in a room with a door wide open to a long, busy hallway. And all of it was recorded by multiple body-worn cameras.

3. As Lt. Smith stood behind Mr. Easterly with a drawn Taser, with Officer Bakker holding Mr. Easterly's left arm and shoulder and Officer Thomas holding his right, Lt. Smith told Mr. Easterly that they knew he had a plastic bag of drugs between

-1-

his buttocks, and ordered him to remove it. When Mr. Easterly started reaching around to do it, Lt. Smith tased him in the lower back and continued to pull the trigger. As the Taser's probes pierced Mr. Easterly's bare-skin and became embedded in it, he screamed in pain as his body convulsed from the shock of 50,000 volts of electricity, then taken down hard to the floor by Lt. Smith and Officers Bakker and Thomas. As Mr. Easterly was being held face-down on the floor, screaming in pain, Lt. Smith sprayed either mace or pepper-spray into his face, then Officer Bakker pushed a Taser into Mr. Easterly's right hip and repeatedly drive-stunned him. On Mr. Easterly's left side, Officer Thomas kneeled down over him, drew his right arm back and repeatedly punched the helpless suffering man in the head, then crawled onto Mr. Easterly's back and gouged his knee into him.

4.     Prostrate on the floor, completely naked, in full and open view of anyone who passed by the doorway, not resisting but still forcibly held down by and/or surrounded by seven or eight corrections officers, including Lt. Smith and Officers Bakker and Thomas, the next indignity Mr. Easterly suffered was Officer Hemphill forcing a mask over his head and onto his face (which had been sprayed with a chemical, burning his eyes, mouth, and nose), smothering Mr. Easterly. He repeatedly told officers he could not breathe and could be seen and heard struggling to breathe.

5.     Eventually, after about ten or so minutes, an officer put pants on Mr. Easterly and officers stood him up. He was escorted out the door, and stopped, as countless passers-by who had likely watched parts of the incident unfold and viewed Mr. Easterly's naked body and genitals, watched him. He was walked into a smaller

-2-

room, put into a restraint chair, and strapped down with five-point restraints, his head and face still covered with the mask, his eyes, mouth, and nose. He continued to plead for someone to help him, telling them that his eyes were burning.

6.     After being strapped down to the chair for half an hour, Lt. Seth Miller ("Lt. Miller") walked into the room and told Mr. Easterly that if he wanted any help, *e.g.*, drops for his burning eyes, he would have to answer some questions for Lt. Miller about the amount of contraband he had brought into the Detention Facility. When Mr. Easterly told him that he had valid prescriptions for the drugs he had brought into the facility, Lt. Miller walked out and never returned.

7.     After being restrained in the chair for approximately three hours – struggling for breath, fighting off the burning in his eyes, mouth, and nose, having been violently jerked out of his bunk and injuring his head, having had his kidney kneed, having suffered multiple tasings and drive-stuns of up to 50,000 volts a piece, having been repeatedly punched in the head, having been maced/pepper-sprayed in the face and eyes and had his face covered with a mask, and having had countless people pass by and view his completely naked body – an officer finally removed Mr. Easterly from the restraint chair and took him to get some eye drops.

8.     Beaten, kneed, shocked, chemical-sprayed, and smothered, his privacy grossly invaded by having his naked body put in public view, Mr. Easterly received painful injuries to his head, his back, his eyes and face, hip, and to his dignity, as he was humiliated by all of it, having chronic headaches, deprived of sleep, and in constant fear all of it would happen again. Yet, he subsequently discovered the most

-3-

humiliating thing of all, as he learned from a corrections officer at the Detention Facility that the Knox County Sheriff's Office ("KCSO") had started using a video of his strip/cavity search and the resulting incident as part of its officer-training program for corrections officers.

9. It appears that no supervisor or officer who participated in the incident received a reprimand or was otherwise disciplined by Sheriff Tom "Spanky" Spangler. Yet, Mr. Easterly was placed in solitary confinement for ninety days without any privileges. And two of the officers charged Mr. Easterly with criminal assault. Not surprisingly, in view of the video evidence, those charges were ultimately dismissed.

10. Among other things, the actions of Lt. Smith, Lt. Miller, Officer Bakker, Officer Thornbury, and Officer Thomas constituted a violation of the Eighth Amendment's prohibition against "the unnecessary and wanton infliction of pain against prisoners." These actions were also taken by them with a complete absence of a penalogical purpose, as each acted maliciously against Mr. Easterly in an unveiled effort to cause him harm.

11. A reasonable, trained, skilled, or proficient corrections officer in the circumstances presented to Lt. Smith, Officer Bakker, Officer Thornbury, and Officer Thomas's would not have believed the force each used on the Plaintiff was necessary, or that it was measured or patterned for the circumstances presented. The

-4-

unconstitutional consequences of failing to train and supervise deputies in the reasonable use-of-force are so patently obvious that the County is liable under § 1983.

12. Defendants, acting under color of law, deprived Mr. Easterly of his constitutional rights under the Fourth, Eighth, and/or Fourteenth Amendments. By this action, brought under 42 U.S.C. § 1983 and Tennessee common law, Plaintiff makes the following claims:

- Count One – 42 U.S.C. § 1983 – excessive use-of-force by Officer Thornbury, individually;

- Count Two – 42 U.S.C. § 1983 – excessive use-of-force by Lt. Smith, Officer Bakker, and Officer Thomas, individually;

- County Three – 42 U.S.C. § 1983 – excessive use-of-force by Lt. Miller, individually;

- Count Four – 42 U.S.C. § 1983 – violation of Plaintiff's right to privacy by Lt. Smith, Officer Bakker, and Officer Thomas, individually;

- Count Five – 42 U.S.C. § 1983 – failure of the County to properly train and supervise corrections officer with respect to the proper use-of-force;

- Count Six – 42 U.S.C. § 1983 – (a) failure of the County to properly train and supervise corrections officers with respect to strip/cavity search procedures, and (b) unreasonable use of Plaintiff's strip/cavity-search videos as an officer-training video for other corrections officers;

- Count Seven – battery by the County, Lt. Smith, and Officers Bakker, Thomas, and Thornbury, individually;

-5-

- Count Eight – invasion of privacy by the County, Lt. Smith, and Officers Bakker and Thomas, individually;

- Count Nine – negligence by All Defendants; and

- Count Ten – intentional infliction of emotional distress by Individual Defendants, individually.

13. Plaintiff seeks all compensatory damages available, including, but not limited to, damages for (a) bodily injury, (b) excruciating physical pain and suffering; and (c) severe emotional suffering, mental anguish, humiliation, despair, and hopelessness.

14. Plaintiff further requests punitive damages against the Individual Defendants, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

15. This civil action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution, and for violations of related Tennessee common law torts. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

16. This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

-6-

17. Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Knox County, within the Northern Division of the Eastern District of Tennessee.

## III. PARTIES

### A. Plaintiff

18. At all times material, Bradley Erwin Easterly ("Plaintiff") was a citizen and resident of Anderson County. Plaintiff was a convicted state prisoner at the time of the incident at the Roger D. Wilson Detention Facility in Knoxville, Tennessee.

### B. Defendants

19. Defendant, Knox County ("County") is a governmental entity and political subdivision of the State of Tennessee, duly organized. It may be served through its chief executive officer, Knox County Mayor Glenn Jacobs, at the Mayor's Office, City County Building, Suite 615, 400 Main Street, Knoxville, TN 37902. The County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual members of the KCSO, and to assure that actions, policies, rules, regulations, practices and procedures of the KCSO and its employees comply with the laws and constitutions of the United States and Tennessee.

20. The County is responsible for training and certifying its law enforcement employees and implementing procedures and protocols to honor and respect the Due Process rights of citizens with whom its law enforcement employees interact.

-7-

21.     At all material times, Lt. Josh Smith ("Lt. Smith") was employed by the KCSO as a supervisor of corrections officers at the Roger D. Wilson Detention Facility ("Detention Facility"). Lt. Smith is sued in his individual capacity and as principal on his official bond. At all relevant times, Lt. Smith was operating under color of law. Lt. Smith is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knox County Sheriff's Office, 400 W. Main St., Knoxville, TN 37902.

22.     At all material times, Lt. Seth Miller ("Lt. Miller") was employed by the KCSO as a supervisor of corrections officers at the Detention Facility. Lt. Miller is sued in his individual capacity and as principal on his official bond. At all relevant times, Lt. Miller was operating under color of law. Lt. Miller is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knox County Sheriff's Office, 400 W. Main St., Knoxville, TN 37902.

23.     At all material times, Officer Adam Bakker ("Officer Bakker") was employed by the KCSO as a corrections officer at the Detention Facility. Officer Bakker is sued herein in his individual capacity and as principal on his official bond. At all times material hereto, Officer Bakker was operating under color of law. Officer Bakker is, upon information and belief, a citizen and resident of Knox County and may be served at the Knox County Sheriff's Office, 400 W. Main St., Knoxville, TN 37902.

24.     At all material times, Officer Kris Thornbury ("Officer Thornbury") was employed by the KCSO as a corrections officer at the Detention Facility. Officer Thornbury is sued in his individual capacity and as principal on his official bond. At

all relevant times, Officer Thornbury was operating under color of law. Officer Thornbury is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knox County Sheriff's Office, 400 W. Main St, Knoxville, TN 37902.

25.    At all material times, Officer Lance Thomas ("Officer Thomas") was employed by the KCSO as a corrections officer at the Detention Facility. Officer Thomas is sued in his individual capacity and as principal on his official bond. At all relevant times, Officer Thomas was operating under color of law. Officer Thomas is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knox County Sheriff's Office, 400 W Main St., 400 W. Main St, Knoxville, TN 37902.

## IV.   FACTUAL ALLEGATIONS

### A.    Officer Thornbury Violently Jerks Plaintiff Off of His Bunk and Hits Him With His Knee

26.    On March 14, 2019, Plaintiff was at the KCSO's Detention Facility[1] in Knox County, Tennessee, awaiting a parole violation hearing on May 29, 2019, and awaiting trial on unrelated charges.

---

[1]The facility is located at 5001 Maloneyville Rd, Knoxville, TN 37918. It has a capacity of 1,036 offenders.

27.     On March 14, 2019, having been booked and processed at the Detention Facility and housed in Unit 1 of Building C, Plaintiff was awakened by Officer Kris Thornbury banging on his cell door. Officer Thornbury instructed Plaintiff not to move, and ordered his bottom-bunk cell-mate to get on the floor.

28.     Once Plaintiff's cell-mate had complied, Officer Thornbury ordered Plaintiff to get down on his stomach on the floor. Plaintiff, making no effort to resist this order, started pulling off his blanket to comply. Before he could do so, however, Officer Thornbury reached up and grabbed Plaintiff's left arm and jerked him violently off the top bunk onto the floor. Although Plaintiff was able to catch himself on his feet, the momentum caused Plaintiff to hit the back of his head, dazing him and causing great pain. Officer Thornbury then pushed Plaintiff into the day-room and told him to get on his stomach. As Plaintiff was on his stomach, Officer Thornbury struck Plaintiff's lower back and kidney hard with his knee, and cuffed him. During all of this, Plaintiff put up no resistance to Officer Thornbury whatsoever.

29.     For weeks following this incident, Plaintiff had constant headaches, a lump on the back of his head, was nervous, and was often unable to sleep, fearing that officers would come into the cell and jerk him out as he slept.

30.     Officer Thornbury then escorted Plaintiff down a long hallway to the medical unit, where Plaintiff was instructed to sit and wait while his cell-mate was strip-searched. The door opened and Plaintiff watched as Lt. Josh Smith ("Lt. Smith") pushed Plaintiff's cell mate out of the room.

-10-

**B.     Strip-Searched, Tased, Punched, and Groped by as Many as Eight Officers**

31.     Once his cell-mate exited, Plaintiff entered the room, and found Lt. Smith and Officers Adam Bakker, Lance Thomas, and Brandon Hemphill waiting for him, with Officers Bakker and Thomas both gripping their Tasers.

32.     Lt. Smith walked up behind Plaintiff and, without warning, jerked Plaintiff's pants and underwear down to his ankles while Officer Baker uncuffed him. By now, Plaintiff was completely naked.

33.     Plaintiff was then instructed to face Lt. Smith, lift his genitals, turn around, put his elbows on the table, bend down, and spread his buttocks. Plaintiff complied with all of these commands.

34.     Plaintiff and his counsel obtained copies of video recordings from two different body-cams that are materially pertinent to his allegations that his civil rights were violated by Knox County and various Corrections Officers after he was escorted to the Detention Facility's medical unit by Officer Thornbury.

35.     Officer Lance Thomas's body-cam video begins with Plaintiff standing in what appears to be the Detention Facility's medical unit (a blood pressure monitor is hanging on the wall). There is no audio in the first thirty-five (35) seconds of Officer Thomas's body-cam recording.

36.     At 00.03, Plaintiff is seen bending over towards a table to his front. As he returns to a standing position, Lt. Smith is seen in the video standing directly behind him. Plaintiff looks to his right, in the direction of Officer Thomas, and raises his hands

-11-

up above his waist. Plaintiff turns, then, at 00:11, clasps his hands around the back of his head. At 00:12, his hands still clasped behind the back of his head, Plaintiff turns to his right.

37.     By now, there are at least three officers surrounding Plaintiff. Officer Bakker, wearing orange gloves, is behind Plaintiff and to his left. Officer Thomas, from whose vantage point this particular video is being recorded, stands to Plaintiff's immediate right. Lt. Smith, not wearing gloves, stands directly behind Plaintiff.

38.     At 00:15, Plaintiff turns again and briefly looks behind him. At 00:16, suddenly, and without warning, Lt. Smith, standing mostly off-screen and directly behind Plaintiff, reaches toward the completely naked Plaintiff with his left hand and hits him hard in the upper back, knocking Plaintiff forward into the table to his front. Plaintiff has offered, at most, passive, verbal resistance to the commands.

39.     At 00:17, Officer Thomas, wearing white gloves, grabs Plaintiff by the right upper arm and shoulder with his left hand, squeezing Plaintiff's shoulder tight. Plaintiff has made no threatening gestures to resist.

40.     From this point, Officer Thomas's body-cam video captures the same events that are depicted in Officer Hemphill's lengthier body-cam video, just from a different vantage-point.

41.     The second video was taken by Officer Hemphill's body-cam. When Officer Hemphill's video begins, Plaintiff is standing completely nude in what  appears to be a medical unit at the Detention Facility with his back to the body-cam, facing a table. Officer Bakker stands to Plaintiff's left, holding a Taser. Officer Thomas stands to

-12-

Plaintiff's right, clad in white gloves, also holding a Taser. Lt. Smith stands behind Plaintiff, Taser drawn and pointed at Plaintiff, the red laser-sight beam targeting his back.

42.     Lt. Smith, holding the Taser in his right hand, appears to be looking at Plaintiff's buttocks, apparently attempting to see if Plaintiff is concealing any contraband, *i.e.*, a plastic bag containing drugs, in his rectum.

43.     Plaintiff bends down and stands back up, apparently as instructed by the officers.

44.     At about 00.06 on the video, Officer Bakker's orange-gloved hand can be seen on the left of the screen, as Officer Thomas, wearing white gloves, appears to instruct him, followed by Lt. Smith, who also appears to instruct him. However, there is no sound to the video at this point.

45.     At 00.15 of the video, Lt. Smith, holding the Taser, steps toward Plaintiff and in front of the body-cam and pushes Plaintiff's right shoulder, using his left hand. At 00:16, Officer Bakker, in orange-gloves, and to the left of the screen, uses his right hand to tug on Lt. Smith's shoulder to move him out of the way of camera-view. Officer Bakker then grabs onto Plaintiff's left shoulder with his left hand, as Officer Thomas grabs Plaintiff's right shoulder with his left hand.

46.     Plaintiff, appearing to have been instructed to do so, has his hands up clasped around the back of his head. All the while, Lt. Smith, holding the Taser, appears to be saying something to Plaintiff.

-13-

47.     At 00.29 of the video, Officer Hemphill finally activates the sound on his body-cam by tapping a button on the device. Lt. Smith, still holding the Taser, says, "you have a bag of drugs between your butt cheeks," which Plaintiff denied.

48.     At 00:35, Lt. Smith, with the Taser, responds, "yes, you do . . . I seen it." At 00.38, Lt. Smith then says, "here's what's gonna happen . . . you're gonna be given the option to reach back there and remove those drugs and drop that bag on the floor." At 00:47, Plaintiff again denies that he is concealing any drugs.

49.     At about 000:54-55, Plaintiff twisted his left shoulder, and one of the officers says, "whoa." At 00:58, Plaintiff is told to "face forward." Plaintiff has not turned around at any point at this juncture. Rather, he barely turned his left shoulder. An officer tells him, "you're getting very close to being tased."

50.     At 00:59-01:01, Lt. Smith says, "Sir, the bag's there, I can see it." At 01:06, Officer Thomas, says, "face forward," but Plaintiff, already facing forward, responds, "I'm facing forward."

51.     At 01:20, Lt. Smith, still holding the Taser, tells Plaintiff that Officer Bakker is going to let go of his left arm, and instructs Plaintiff to reach back with his left hand and remove the bag and drop it to the floor, saying "If you do anything else, I'm going to tase you. Do you understand?" At this point, Plaintiff's left arm is being held by Officer Bakker, and he is being held around the neck and right arm by Officer Thomas.

52.     At 01:24, Officer Bakker let go of Plaintiff's left arm and let Plaintiff move his arm down to where he could reach around behind him and retrieve any drugs from

-14-

between his buttocks. At 01:25, Plaintiff says "there's nothing there," then started to do as Lt. Smith had commanded, reaching toward his buttocks, still making no effort to resist.

53.     At 01:26, Lt. Smith – who appears to be approximately three to four feet behind the well-restrained Plaintiff – immediately pulls the trigger on the Taser, firing two probes carrying about 50,000 volts of electricity directly into Plaintiff's mid-lower bare back, about six inches apart.[2]

54.     There are no fewer than five officers surrounding Plaintiff when he is tased by Lt. Smith, which occurs at 01:28 on Officer Thomas's video. One officer holds a flashlight. Lt. Smith still holds a Taser. Officer Bakker is wearing orange gloves. Officer Thomas is wearing white gloves. A fifth officer stands near the doorway, behind Lt. Smith, as Lt. Smith tases Plaintiff at 01:29 of Officer Thomas's video.

55.     Beginning at 01:27 on Officer Thomas's video, Plaintiff winces and screams in pain, as 50,000 volts charge through his body, making it convulse as he leans toward the floor while the crackling sound of the Taser is still heard.

56.     By reflex, Plaintiff tried to swat the Taser wires and probes away. The sound made by the Taser continues as one officer tells Plaintiff to get down.

_____

[2]According to Lt. Smith, Plaintiff failed to obey a command to put his hands on his head. He stated that he tased Plaintiff as Plaintiff was trying to shove the plastic bag further into his rectum. This, however, is not supported by video evidence of the incident, which only shows Plaintiff reaching back to remove the bag. None of the officers present reacted or made any comments on the video that might even have implied that Plaintiff attempted to shove the bag further into his rectum.

-15-

57.     Lt. Smith stated that the first tase had "minimal effect" on Plaintiff who, Lt. Smith stated, began to "resist all control" and try to remove the Taser probes. The video evidence of the incident contradicts these statements by Lt. Smith. There is no evidence whatsoever that Plaintiff actively resisted the officers prior to getting repeatedly tased, drive-stunned, punched, and kneed by Lt. Smith and Officers Bakker and Thomas.  At that time, Plaintiff's body was convulsing and he reflexively tried to defend himself from further injury and abuse.

58.     Lt. Smith stated that he then drive-stunned Plaintiff in the thigh (by placing the Taser on his thigh and pulling the trigger). As Plaintiff seizes from the shock, an officer yells, "get on the ground." At 01:39 of Officer Thomas's video, Officer Bakker grabbed Plaintiff from behind, as Plaintiff's body is convulsing and succumbing to the shocks. Officer Bakker, with the help of Lt. Smith, Officer Thomas, and other officers, then appears to force Plaintiff onto the floor face-first.[3] Plaintiff said, "get off me" and "cut it out," screaming and moaning in pain.

59.     From 01:51-01:55, Officer Thomas is seen to the left of the screen, drawing his right arm back and repeatedly punching Plaintiff about the head and face.[4] At the same time, the other officers are twisting and turning Plaintiff limbs and groping him.

---

[3]At 01:40, Officer Thomas's body-cam video goes dark until 07:21, when it shows Plaintiff on his on-the-floor surrounded by several officers.

[4]Officer Thomas admitted to delivering multiple "closed fist strikes" to Plaintiff's head, stating that he did so "to gain compliance." Yet, Plaintiff, having been repeatedly tased and stunned, was already on his stomach on the floor and surrounded by numerous corrections officers.

-16-

60.     At 01:56-57, an officer hands Officer Bakker a Taser. Between 01:59-2:05, as Lt. Smith, Officer Thomas, and others hold Plaintiff down on the floor, Officer Bakker reaches between them and repeatedly drive-stuns Plaintiff by placing a Taser against his right hip and torso, as the Taser two probes are seen imbedded in Plaintiff's bare back. Plaintiff felt an electric shock to his ribs, as he was tased again by Officer Bakker. Plaintiff can be heard screaming in pain.

## C.    Holding Plaintiff Face-down on the Floor; Unable to Breathe

61.     At that point, at least four officers begin to put Plaintiff's legs and arms in cuffs or other restraints, as the naked and defenseless man remains face-down on the floor. At 02:07, Officer Thomas, who had previously punched Plaintiff repeatedly in the face or head, places his left knee on Plaintiff's chest and pushes down.

62.     At 02:45-46, Plaintiff, whose face is pressed into the floor, repeatedly says "I can't breathe, I can't breathe."  At 02:53, a female enters the room, wearing black gloves,[5] and says "where's he at?" She leans over the naked Plaintiff. From 02:57-03:09, five officers are seen on top of Plaintiff, holding him down, cuffing him, and standing on his legs, attempting to "hog-tie" him, as Plaintiff continues to say, "I can't breathe."

63.     At 02:58, a crying and helpless Plaintiff says, "I want my momma." By 03:18, there are no fewer than seven officers in the room surrounding Plaintiff, as he

---

[5]Lt. Smith stated that this was "Nurse Davies" and that she came into the room and "evaluated" Plaintiff.  However, on the video, Nurse Davies simply removed the Taser probes from Plaintiff's back.

is hog-tied face-down on the floor, and at 03:39, he is still telling them he cannot breathe. At 03:46, Officer Bakker is pushing down on Plaintiff's back with both of his hands, as Plaintiff continues to cry for air.

**D.    Begging for Someone to Help Him; Choking; Still Unable to Breathe**

64.    At 03:50, Plaintiff says, "can you please help?" At 03:59, one of the officers says, "if you're talking, you're breathing."

65.    By 04:07, the video shows the two Taser probes that pierced through the skin on his back. At 04:09, a blonde-haired female officer or nurse attempts to pull the probes out of the naked Plaintiff's back, but both of them are stuck underneath his skin. At 04:18, the officer is twisting and pulling on the probes stuck in Plaintiff's back and he screams in pain again and yells, "no."

66.    Finally, at 04:33, the female pulls the probes out of Plaintiff's back, leaving two bleeding holes, about six inches apart.

67.    At 04:53, Plaintiff complains that he thinks his wrist is broken.

68.    At 05:29, Plaintiff can be heard choking, as his face remains pressed against the floor and officers unchain his legs to put pants on him. By 06:04, the officers have put pants on Plaintiff. At 06:15, they put the chains back on his ankles.

69.    By 06:44, the Taser's red laser beam is again sighted on Plaintiff's back as he is hog-tied on the floor with at least six officers surrounding him.

### E. Pepper-spayed or Maced in the Face; Masked

70.     At some point, Lt. Smith sprayed the Plaintiff with pepper-spray or mace and at 7:07, Officer Hemphill began to put a spit-mask over Plaintiff's face, smearing mace into Plaintiff's eyes, mouth, and nose, and causing Plaintiff's face to burn. All of this caused Plaintiff to feel as though he was suffocating.

71.     At 07:23, Plaintiff began to say repeatedly, "I can't breathe," as a Taser is seen on-screen inches away from his back again, wielded this time by an officer wearing white gloves (possibly Officer Thomas). Plaintiff keeps repeating, "I can't breathe, ya'll. I cannot breathe," and continues to cough and choke.

### F. Placed in Five-Point Restraints in Restraint Chair for Hours

72.     At 08:07, the officers roll Plaintiff onto his back. He is on his feet by 08:15, being walked out of the room by several officers. An officer instructs him to get against the wall, but Plaintiff complains that he cannot see. Another officer says, "you don't gotta see to listen . . . . You're gonna listen to what we're telling you to do, understood?"

73.     Plaintiff was escorted to another room. By 11:22, Officer Baker and at least three other officers are strapping Plaintiff into a restraint chair and proceed to hold his head down, with the spit-mask still covering his face, strapped in by five-point restraints.[6]

---

[6]Lt. Smith stated that Plaintiff was put into the restraint chair "due to his violent behavior." Of course, this statement, as noted above, is contradicted by video evidence of the incident.

74.    Plaintiff was left with a spit-mask on his head and face – strapped in five-point restraints in the restraint chair –  for several hours. He begged for someone to clean the mace/pepper-spray off of his face, but was ignored. The chemicals were burning his eyes, mouth, and nose, and making it exceedingly difficult for him to breathe. Eventually, Plaintiff suffered from a panic attack while strapped down, and believed he was going to die.

### G.    Lt. Miller's *Quid Pro Quo*

75.    Finally, after about a half hour, Lt. Seth Miller ("Lt. Miller") came into the room and told Plaintiff that he might get some eye drops for him and unstrap him from the chair, but that depended on how Plaintiff answered some questions for him. Lt. Miller asked Plaintiff "how many strips were in the bag and how many Klonopin were in there?" Plaintiff informed Lt. Miller that both Suboxone and Klonopin – the drugs he was holding – had actually been prescribed for him by a doctor and that those prescriptions had been filled two days earlier at a local pharmacy. Lt. Miller said he would verify this information and left the room.

76.    Plaintiff sat restrained in the chair for several hours, suffocating from the mask over his face, unable to use his hands to wipe away the chemicals in his eyes, mouth, and nose, while still in pain from the repeated shocks caused by the repeated tasing, and bleeding from his rectum.[7]

77.    Plaintiff was eventually removed from the restraint chair and taken to a medical unit, where he was given some drops for his still-burning eyes.

---

[7]This bleeding continued for weeks.

-20-

**H.     The Unreasonable Punishment Continues**

78.     When Plaintiff was returned to his cell, an officer told him that Lt. Smith had ordered that Plaintiff's mattress be removed, and he discovered that they not give him any underwear, socks, a shirt, sheets, a blanket, or any basic hygiene products. About eight hours later, Plaintiff was returned to his original cell, and given some bare necessities.

79.     From that moment, officers at the Detention Facility frequently laughed at Plaintiff and made fun of him for what he had gone through. These officers informed Plaintiff that they had watched the video of him being stripped naked, tased, punched, and maced/pepper-sprayed, causing Plaintiff to suffer still further humiliation.

80.     From the moment Officer Thornbury jerked Plaintiff out of his bunk until the officers were strapping him into the restraint chair, Plaintiff offered only passive resistence, if any resistance at all.

81.     During the incident, the officers made remarks which were clearly intended to justify their unconstitutional actions. For instance, Officer Thomas said "he is biting me," before repeatedly punching Plaintiff. Yet, neither of the video recordings Plaintiff's counsel obtained show Plaintiff resisting at all, much less attempting bite anyone or assault them.

82.     Plaintiff was written up for disciplinary infractions, which found that he had assaulted two officers and was in possession of contraband. As a result, he was placed in solitary confinement and his privileges were taken away for ninety days.

-21-

83.     Plaintiff was also charged by the state with introduction of contraband into a penal facility and assault on a public/private employee.[8] Plaintiff pleaded guilty to contraband in a penal facility, misdemeanor simple possession, and possession of drug paraphernalia in July 2020, but the charges for assault were dismissed. Therefore, there are no pending state charges related to the incident. Any charge that might have indicated or otherwise implied Plaintiff had resisted his captors during the strip/cavity-search on March 14, 2019 was dismissed.

84.     Plaintiff's efforts to complain to the KCSO administration about the incident were largely disregarded. Plaintiff completed and submitted a complaint about what had happened to him on March 14, 2019 during the strip/cavity-search at the Kiosk at the Detention Facility. Several days later, he was "interviewed" by a detective, who simply informed him that he needed to file a "grievance." Plaintiff completed a grievance form and turned it in on March 26, 2019. Nothing came of it.

85.     During his incarceration at the Detention Facility, Plaintiff witnessed similar unconstitutional actions by Lt. Smith and Officer Thomas directed at other inmates there.

---

[8]Lt. Smith charged Plaintiff with assault, stating Plaintiff "kicked" him. Officer Thomas also charged Plaintiff with assault, stating that Plaintiff bit his finger.

-22-

## V. WAIVER OF IMMUNITY

86.     The County has waived immunity for its own negligence and for its

employees, misconduct of officers acting under color of law, and for the negligence of

deputies, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for

individuals for criminal conduct, or conduct which is willful or malicious.

## VI. CLAIMS FOR RELIEF

### COUNT ONE

### EXCESSIVE FORCE

### Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth Amendments

### (Against Officer Thornbury, Individually)

87.     The allegations of the preceding paragraphs of this Complaint are hereby

incorporated by reference, as if set forth verbatim.

88.     When a convicted prisoner like Plaintiff, a parolee awaiting a hearing a

parole violation, asserts claims of excessive force, the Eighth Amendment's ban on

cruel and unusual punishments applies, prohibiting the unnecessary and wanton

infliction of pain.

89.     The last thing a corrections officer should want to do is go "hands-on" with

someone or use force, or more force than is necessary.

90.     Officer Thornbury used excessive force when he violently jerked Plaintiff

out of his bunk, hit Plaintiff's head, pushed Plaintiff into the dayroom,  and then stuck

his knee into Plaintiff's back and kidney with all of his weight. This unjustified use-of-

force deprived Plaintiff of his fundamental guarantee to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution, as applied to state actors by the Fourteenth Amendment.

91.     Officer Thornbury's use of force was unnecessary and gratuitous, especially as it occurred while Plaintiff was unarmed and not resisting commands, passively or otherwise, much less displaying active resistance or aggression.

92.     At the moment Officer Thornbury violently jerked Plaintiff out of his bunk, causing an injury to Plaintiff's head, and as Officer Thornbury stuck his knee into Plaintiff's back, Officer Thornbury lacked a reasonable belief or probable cause to believe his – or anyone's – safety was at risk.

93.     No reasonable officer under the circumstances would have believed that the use of force against Plaintiff– *on both occasions* – was lawful. Even if some force were constitutionally reasonable (it was not), the degree of force used was clearly excessive and unconstitutionally disproportionate to the circumstances.

94.     Officer Thornbury's actions constituted a violation of the Eighth Amendment's prohibition against "the unnecessary and wanton infliction of pain against prisoners."

95.     The actions of Officer Thornbury were taken by him with a complete absence of a penalogical purpose, making clear he acted maliciously against the Plaintiff in an effort to cause him harm.

96.     Plaintiff's Eighth Amendment rights were violated as there was no need for physical force to compel Plaintiff to get out of his bunk and walk to the medical

-24-

unit. Plaintiff did not resist or physically threaten Officer Thornbury or other officers or inmates.

97. The violations of Plaintiff's Eighth Amendment rights by Officer Thornbury directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness. Furthermore, Officer Thornbury's conduct was also willful, wanton, malicious, and done with reckless disregard for Plaintiff's federally-protected rights, justifying an award of punitive damages against him so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct, warranting punitive damages.

98. Plaintiff sues Officer Thornbury for violating his constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

## EXCESSIVE FORCE

### Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth Amendments

### (Against Lt. Smith, Officer Thomas, and Officer Bakker, Individually)

99. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

-25-

100.    Here, Lt. Smith had Officer Thornbury escort Plaintiff to the medical unit at the Detention Facility for what appears to have been a strip search or cavity search, unless the Plaintiff agreed to remove whatever contraband he had by his own hand.

101.    When Plaintiff entered the medical unit, he was met by a contingent of up to eight corrections officers, each presumably armed with Tasers, pepper-spray or mace, and other less-deadly or non-deadly weapons. Officers Bakker and Thomas quickly grabbed hold of Plaintiff by his arms and shoulders, as Lt. Smith stood two or three steps behind him with his Taser drawn and the red laser-beam sight fixed on Plaintiff's mid-lower back.

102.    Lt. Smith quickly decided to escalate the situation into a physical confrontation by tasing Plaintiff, just as Plaintiff was doing exactly as Lt. Smith had commanded, *i.e.*, reaching his left hand behind him to remove something from between his buttocks. Lt. Smith tased Plaintiff multiple times after he attempted to comply with Lt. Smith's command, first deploying the Taser's two probes directly into Plaintiff's bare back, where they became imbedded under his skin.

103.    As Plaintiff was on his stomach and/or side on the floor, an unidentified corrections officer handed Officer Bakker a Taser, and Officer Bakker stuck the Taser directly onto Plaintiff's hip/lower back and repeatedly drive-stunned him.

104.    As Plaintiff was on his stomach on the floor with as many as eight officers surrounding him, Officer Thomas can be seen drawing his right arm back at least twice

-26-

and punching Plaintiff hard in the face/head with his closed fist. He also put his left knee hard on Plaintiff's head and upper back as Plaintiff was face-down on the floor being held down by as many as seven officers.

105.    Tased repeatedly with up to 50,000 volts of electricity, Plaintiff's body convulsed severely due to the pain. He reacted, in part, by trying to knock the probes and Taser wires away. He also – reflexively – briefly flung his arms around before the repeated shocks – and multiple officers – put him down onto the floor on his stomach.

106.    During this time, numerous officers were grabbing at Plaintiff's arms, hands, legs, feet, and head, holding him down, sticking their knees into him, and otherwise man-handling him.

107.    At some point as Plaintiff was on the floor, Lt. Smith sprayed Plaintiff's face with mace or pepper-spray.

108.    Lt. Smith, Officer Bakker, and Officer Thomas's actions constituted a violation of the Eighth Amendment's prohibition against "the unnecessary and wanton infliction of pain against prisoners."

109.    The actions of Lt. Smith and Officers Bakker and Thomas were taken by them with a complete absence of a penalogical purpose, making clear each acted maliciously against the Plaintiff in an effort to cause him harm.

110.    Plaintiff's Eighth Amendment rights were violated as there was no need for physical force to compel Plaintiff to remove the plastic bag. He did not physically threaten Lt. Smith, Officer Bakker, Officer Thomas, or other officers.

-27-

111.    Instead, Lt. Smith tased Plaintiff merely to enforce an order to remove the plastic bag, not to protect officers or other inmates.

112.    Officer Bakker drive-stunned Plaintiff with a Taser on his hip and against his bare-skin after Plaintiff had already been repeatedly tased by Lt. Smith, after the unarmed Plaintiff, who, at most, was passively resisting orders, had been taken down to the floor by several officers, and surrounded by them.

113.    Similarly, after Plaintiff had been repeatedly tased by Lt. Smith, drive-stunned by Officer Bakker, and was being held down on the floor face down by as many as seven or eights officers, Officer Thomas, without provocation or purpose, punched Plaintiff about the head and/or face multiple times.

114.    The actions of Lt. Smith, Officer Bakker, and Officer Thomas were taken by them with a complete absence of a penalogical purpose, making clear they acted maliciously against the Plaintiff in an effort to cause him harm.

115.    The violations of Plaintiff's Eighth Amendment rights by Lt. Smith, Officer Bakker, and Officer Thomas directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness. Furthermore, their conduct was also willful, wanton, malicious, and done with reckless disregard for Plaintiff's federally-protected rights, justifying an award of punitive damages against them so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct, warranting punitive damages.

-28-

116.     Plaintiff sues Lt. Smith, Officer Bakker, and Officer Thomas for violating

his constitutional rights, and seeks any and all damages allowable, attorney's fees

pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT THREE

## EXCESSIVE FORCE

### Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Eighth and Fourteenth Amendments

### (Against Lt. Miller, Individually)

117.     The allegations of the preceding paragraphs of this Complaint are hereby

incorporated by reference, as if set forth verbatim.

118.     About a half hour after Plaintiff was placed in five-point restraints, still

wearing the "spit-mask," his eyes, mouth, nose, and face still burning from the

mace/pepper-spray, Lt. Miller told him that he could have drops to ease his pain

depending on how he answered Lt. Miller's questions. Lt. Miller then proceeded to ask

Plaintiff questions about the contraband that had been found on him. When Plaintiff

said the drugs were validly prescribed to him by his doctor, Lt. Miller said he would

check on that, and walked out of the room. Plaintiff remained restrained in the chair,

mask still covering his burning eyes and face, for several hours.

119.     Lt. Miller's actions constituted a violation of the Eighth Amendment's

prohibition against "the unnecessary and wanton infliction of pain against prisoners."

Lt. Miller's actions against Plaintiff were tantamount to torture. After all, the

contraband drugs had already been confiscated from Plaintiff by other officers. There

-29-

was no need, therefore, for Lt. Miller to keep Plaintiff bound and gagged in the restraint chair, his eyes, mouth, nose, and face burning from the chemical that Lt. Smith had sprayed onto him.

120.    Nor, given his bound and gagged status, did Plaintiff present a threat to Lt. Miller or other officers. Lt. Miller's actions had no effect other than to inflict pain, discomfort, and punishment on Plaintiff, not to protect Lt. Miller, other officers or other inmates.

121.    The actions of Lt. Miller were made with a complete absence of a penalogical purpose, making clear he acted maliciously against the Plaintiff in an effort to cause him harm.

122.    The violations of Plaintiff's Eighth and Fourteenth Amendment rights by Lt. Miller directly and proximately caused Plaintiff to suffer (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness. Furthermore, their conduct was also willful, wanton, malicious, deliberately indifferent, and done with reckless disregard for Plaintiff's federally-protected rights, justifying an award of punitive damages against them so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct, warranting punitive damages.

123.    Plaintiff sues Lt. Miller for violating his constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

-30-

## COUNT FOUR

## RIGHT TO PRIVACY

### Violation of Civil Rights under Color of Law,
### 42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments

### (Against Lt. Smith, Individually, and
### Officers Bakker and Thomas, Individually)

124.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

125.    Plaintiff was forcibly stripped completely naked[9] by Lt. Smith, Officer Bakker, Officer Thomas, and others, who, upon information and belief and video evidence, periodically opened the door of the medical unit to a long, busy hallway where countless people were wandering by and looking on – under the supervision of Lt. Josh Smith.

126.    In unreasonably and unjustifiably forcing Plaintiff to expose his naked body and genitals to innumerable strangers, men and woman alike, Lt. Smith and Officers Bakker and Thomas violated Plaintiff's clearly established right to privacy.

127.    As the United States Court of Appeals for the Sixth Circuit has noted, "a convicted prisoner maintains some reasonable expectations of privacy while in prison

---

[9]Most people "have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons." *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

. . . even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir.1992). Any intrusion on an inmate's right to privacy is valid if it "reasonably relates to legitimate penalogical interests." Here, unnecessarily exposing Plaintiff's completely naked body to onlookers and other passers-by in proximity of the medical unit was not reasonably related to any legitimate penalogical interest.

128. Being stripped naked is a particularly severe intrusion on the right to privacy. *See, e.g., Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1104 (W.D. Mich. 2000). A strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual. It is a practice that the Supreme Court says has given it "pause," *Bell v. Wolfish*, 441 U.S. 520, 558 (1979), since "[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many . . . ." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1524 (2012).

129. "[T]he Fourth Amendment protects prisoners from searches and seizures that go beyond legitimate penalogical interests. Searches of prisoners must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013).

130. Plaintiff had a well-established right "not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penalogical interest." *Stoudemire*, 705 F.3d at 575.

131.    Plaintiff does not contest or otherwise challenge the actual decision to search him. Unquestionably, detecting and deterring the possession of contraband is a legitimate penalogical objective. However, the seizure of Plaintiff in this instance clearly exceeded one of a legitimate penalogical purpose.

132.    Plaintiff, fir example, was never asked or afforded an opportunity by Defendants to strip off his own clothes in private. Instead, Lt. Smith came up behind him and jerked off his pants and underwear. *See Williams v. City of Cleveland*, 771 F.3d 945, 955 (6th Cir. 2014) (recognizing that "strip searches would be even more humiliating if, instead of giving detainees a chance to remove their own clothing, corrections officials simply did it for them.").

133.    Lt. Smith stated that he had identified a plastic bag between Plaintiff's buttocks, yet apparently gave no consideration at any point to retrieving the bag himself or having another officer do it. Rather, he opted for a violent confrontation, resulting in Plaintiff – who had offered, at most, only passive resistance – being repeatedly tased, drive-stunned, groped by multiple officers, and punched.

134.    Even if it was appropriate for male officers to disrobe Plaintiff, nothing justified their forcible conduct, nor the presence of female officers. The location of the stripping further amplified the intrusion in this case because Plaintiff was stripped in a room accessed by countless people, who watched over parts of an approximate ten-

-33-

minute period. Indeed, any privacy that the medical unit could or should have afforded was obviated by the fact the door was periodically opened such that people could and did in fact watch Plaintiff suffer through the incident.[10]

135.    There were no exigent circumstances that might have compelled the Individual Defendants to strip-search Plaintiff in view of other inmates and/or jail personnel, including female jail personnel. The record simply suggests no such exigencies, as no emergency made such a search necessary.

136.    Plaintiff was also positioned so that, when the door was open, passers-by had an unobstructed view of him.

137.    Being made to expose oneself to a member of the opposite sex[11] and numerous other strangers would be highly intrusive to any ordinary person.

138.    Being made to expose himself to countless other people who were not even participating in the strip/cavity search, including other inmates, caused Plaintiff severe emotional injuries and loss.

139.    Here, the efforts made to protect Plaintiff's privacy as the incident in the medical unit unfolded were virtually nonexistent. Not only was Plaintiff's naked body completely exposed to the seven or eight male officers, including at least one female

_____

[10]The noise and commotion caused by all of the violence perpetrated on the Plaintiff – *e.g.*, Plaintiff screaming in pain – only exacerbated the number of people paying attention to what was going on in the medical unit.

[11]At least one female came into the medical unit during the incident, while Plaintiff was on his stomach on the floor. She bent over him and reached for and ultimately retrieved the two Taser probes that had lodged into Plaintiff's skin on his lower back.

officer or nurse, for all or part of a ten-minute period, but because the door to the medical unit was periodically opened, Plaintiff was exposed to numerous other male and female officers who were not even involved in the strip-search, as well as to numerous passers-by who just happened to be in proximity to the medical unit.

140. A reasonable officer in Defendants' positions should have known that his conduct, as described, was undertaken in violation of Plaintiff's privacy rights. Defendants' unreasonable, forced exposure of Plaintiff's utterly and completely naked body to officers, other inmates, and passers-by during the protracted incident violated his clearly established right to privacy under the Fourth Amendment. *See, e.g., Cornwell v. Dahlberg*, 963 F.3d 912, 916 (6th Cir. 1992); *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013).

141. No legitimate penalogical interest or emergency circumstance existed to justify allowing so many people to watch the strip/cavity search of Plaintiff's completely naked body.

142. At the time Defendants strip-searched Plaintiff, ample alternative locations existed to conduct the search – including Plaintiff's own cell, as was the normal practice, and several visitation or isolation cells out of view of others – that would not have violated Plaintiff's privacy by exposing him to countless others.

143. At the time of Defendants' violation of Plaintiff's privacy right, it was clearly established that conducting strip searches that would expose the subject's naked body to members of the opposite sex and other strangers violates the Fourth Amendment's guarantee to privacy, absent special circumstances not present here.

-35-

144. By forcing Plaintiff to expose his completely naked body and genitals to officers not directly involved in the strip/cavity search of Plaintiff, to other inmates, and to passers-by for a protracted period, Lt. Smith and Officers Bakker and Thomas intentionally intruded upon Plaintiff's bodily solitude and seclusion.

145. As a result of Defendants conduct, Plaintiff's suffered damages, including, but not limited to, severe emotional pain and suffering, humiliation, and emotional distress.

146. Plaintiff sues Lt. Smith and Officers Bakker and Thomas for violating his constitutional rights, and seeks any and all damages allowable, including punitive damages, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT FIVE

## FAILURE TO TRAIN AND SUPERVISE

### Violation of Civil Rights under Color of Law,
### 42 U.S.C. §§ 1983 and 1988 under Fourth, Eighth,
### and Fourteenth Amendments

### (Against the County)

147. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

148. Sheriff Tom "Spanky" Spangler has final authority and makes policy for the KCSO in establishing and implementing policies and/or procedures with respect to the use of force by deputies against inmates and the legal limits of such activities for deputies employed by the KCSO.

-36-

149.    Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of force are so patently obvious that the County and Sheriff Spangler are liable under § 1983. The actions of the individual Defendants –

■ the unnecessary violent jerking of Plaintiff out of his bunk, hitting Plaintiff's head, and kneeing Plaintiff in the back by Officer Thornbury, when Plaintiff offered no resistance;

■ the unnecessary and repeated tasing of Plaintiff by Lt. Smith and drive-stunning of Plaintiff by Lt. Bakker that escalated a body-cavity search into a full-fledged violent confrontation, when Plaintiff offered only passive resistance, if any;

■ the unnecessary repeated punching of Plaintiff by Officer Thomas when Plaintiff was surrounded by and held down on the floor by numerous officers, offering little resistance, if any;

■ the unnecessary macing/pepper-spraying of Plaintiff by Lt. Smith when Plaintiff was subdued by numerous officers and had offered only passive resistance, if any;

■ the unnecessary physical takedown of Plaintiff by the Individual Defendants and unidentified others when Plaintiff offered only passive resistance, if any; and

■ the unnecessary and unreasonable actions of Lt. Miller in forcing Plaintiff to be masked and restrained in a five-point restraint chair for several hours after being maced/pepper-sprayed and refusing to provide him any aid from the burning in his eyes, mouth, nose, and on his face –

demonstrate such obvious and egregious training and supervisory deficiencies to make KCSO's use-of-force training constitutionally defective.

150.    Upon information and belief, as final policymaker for the KCSO, Sheriff Spangler established and implemented policies and procedures, and/or ratified

-37-

pre-existing policies and procedures, regarding the use of force by KCSO corrections officers against inmates, which policies and procedures themselves violate federal constitutional law.

151.   Even if the policies and procedures regarding the use of force by corrections officers against inmates do not themselves violate federal law, there is and was – at the time of the violent encounter between Plaintiff and corrections officers – a persistent and widespread practice among KCSO corrections officers of using excessive force on a subject when it is unnecessary and objectively unreasonable as a matter of law to do so, amounting to a custom or course of conduct so widespread as to become informal KCSO policy, acquiring the force of law.

152.   And even if the formal policies and procedures of the KCSO are not themselves unlawful, alternatively, the operation of such policies and procedures reflects a standard operating procedure, and a widespread and persistent practice, of KCSO deputies violating inmates' federally-protected rights as identified herein.

153.   At all times material, Sheriff Spangler and the County have known or have had constructive knowledge of this widespread and persistent practice of violations, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations.

154.   The response by Sheriff Spangler and the County to these constitutional violations has been inadequate.  These include but are not limited to:

- the lack of or inadequate mechanism for identifying or tracking unconstitutional uses of force;

-38-

- the lack of or inadequate documentation of individual uses of force, and the justification for such;

- the lack of or inadequate supervisory review of documentation of individual uses of force and the justification for such;

- the lack of or inadequate mechanism for monitoring or tracking uses of force;

- the lack of unbiased investigation of complaints of improper uses of force;

- the lack of or inadequate investigation of complaints of improper uses of force;

- the lack of or inadequate training regarding the legal limitations on the permissible use of force; and

- the lack of or inadequate discipline of individual officers found to have committed unlawful uses of force.

155.    Violations of inmates' constitutional rights of the type inflicted on Plaintiff, specifically the use of excessive force, are the known or obvious consequences either of formal County or KCSO policies and procedures that violate federal law, or of a widespread and persistent practice and custom of such violations to which Sheriff Spangler and the County have acquiesced or have tacitly authorized. The actions and omissions of Sheriff Spangler and the County, as identified herein, reflect deliberate indifference on the part of Sheriff Spangler and the County to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Plaintiff's federally-protected rights.

-39-

156. Such widespread and persistent violations of inmates' constitutional rights, as condoned by Sheriff Spangler and the County, were the moving force behind – and directly and proximately caused – the violations of Plaintiff's constitutional rights; and render the County liable.

157. The County, KCSO, and Sheriff Spangler failed to train and supervise their corrections officers to avoid using excessive force, failed to meaningfully investigate allegations of such force, and attempted to conceal unconstitutional conduct by failing to conduct transparent investigations, and by unreasonably exonerating officers, like Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury, through sham investigations or no investigations at all.

158. The County, KCSO, and Sheriff Spangler had a duty of care to ensure that KCSO officers were properly trained in the appropriate procedure for using force against inmates. This duty extends to ensuring that KCSO officers were properly trained concerning the limits of their authority to use force.

159. The County, KCSO, and Sheriff Spangler had a duty to properly supervise KCSO officers and ensure KCSO supervisory officers did not condone the unnecessary uses of force. This is especially true when there is (a) a "likelihood that [a] situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Officers must have specific training to be equipped to properly react to situations, as in this case, without unnecessarily escalating them to force situations.

-40-

160.    In this case, Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury lacked the tools that the County, KCSO, and Sheriff Spangler should have provided them to safely handle the recurring situation. Consequently, he unnecessarily escalated the level of force, over what began as a routine body-cavity search.

161.    By failing to conduct a meaningful investigation of Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury, Sheriff Spangler let it be known that he condoned their unreasonable use-of-force.

162.    By ratifying the unreasonable use-of-force by Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury, Sheriff Spangler knowingly acquiesced in the unconstitutional conduct of those officers through the execution of his job function, rendering the County liable to Plaintiff.

163.    The County, KCSO, and Sheriff Spangler's failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use-of-force and to properly train its officers and supervisors to follow such guidelines constitute deliberate indifference to the constitutional rights of inmates.

164.    The failure of Sheriff Spangler – and unknown supervisors – to recognize or appreciate the gravity of the actions of Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury imply that they found no wrong in such conduct, all but "green lighting" Eighth Amendment violations by KCSO  deputies.

165.    Here, Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury believed their actions would not be properly monitored or corrected by supervisory officers and would be tolerated and accepted. Their belief was prescient.

-41-

166.    As a direct and proximate result of the actions/omissions of the County, KCSO, and Sheriff Spangler causing the violation of his Eighth Amendment rights, Plaintiff suffered (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness.

167.    Plaintiff sues the County for violating his constitutional rights, and seeks any and all damages allowable, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT SIX

### FAILURE TO TRAIN AND SUPERVISE –
### FOURTH AMENDMENT PRIVACY VIOLATION

**Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments**

**(Against the County)**

168.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

### *(a) Strip/Cavity Search*

169.    Knox County violated Plaintiff's clearly established right to privacy under the Fourth Amendment by failing to adequately train, supervise, and discipline correctional officers sufficient to prevent exposure of naked inmates in their custody to members of the opposite sex and other strangers unless absolutely necessary.

170.    Knox County has failed in its duty to train correctional officers to properly conduct strip searches in a place and manner that does not violate inmate's clearly established privacy rights.

-42-

171.    In the alternative, Knox County, through its policymaker, Sheriff Spangler, implicitly ratified the unconstitutional actions of the Individual Defendants by refusing to discipline them, thus confirming that their actions in exposing Plaintiff's naked body and genitals to male and female officers alike, to civilians, and to other inmates were consistent with, and indeed, pursuant to, Knox County's policy.

172.    Knox County's failure to train, supervise, and discipline its correctional officers was the moving force behind the invasion of Plaintiff's right to privacy under the Fourth Amendment.

173.    Knox County acted with deliberate indifference to Plaintiff's privacy right under the Fourth Amendment it its failure to train and supervise its correctional officers.

174.    At the time the strip/cavity search occurred, there was an obvious need to train and supervise KCSO correctional officers because it is within their job responsibilities to conduct strip/cavity searches, which are inherently invasive and would foreseeably result in privacy violations without adequate training and supervision.

175.    As a direct and proximate result of Knox County's policy, practice, and custom in violation of Plaintiff's rights, Plaintiff suffered damages, including severe humiliation and emotional distress.

176.    Plaintiff sues the County for violating his constitutional rights, and seeks any and all damages allowable, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

### (b) Using Video of Plaintiff's Strip/Cavity
### Search as an Officer-Training Video

177.    The most egregious violation of Plaintiff's right to privacy came when the County and KCSO began using the video of the Plaintiff's strip-search and the incident as a training video or tool for all corrections officers as part of the corrections-officer training program.

178.    Plaintiff was informed by at least one Corrections Officer at the Detention Facility that Knox County and the KCSO are using one or the videos of the incident involving the strip/cavity search during officer-training sessions.

179.    These videos are shocking, as they depict Plaintiff in a state of complete and utter nakedness, being held down, groped, repeatedly tased, punched, hit with a knee by as many as eight corrections officers. During at least one video, immediately after he was initially tased by Lt. Smith, Plaintiff was turned around and facing Officer Hemphill, whose body-cam was recording, and the following seconds depict a full-frontal view of Plaintiff, including his genitals.

180.    In this Circuit, "'a convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners.'" *Stoudemire*, 705 F.3d at 572 (quoting *Cornwell*, 963 F.2d at 916.

181.    Plaintiff's claim that Knox County is using the video of his strip/cavity search in officer-training adequately alleges a violation of Plaintiff's constitutional rights.

-44-

182.     Because Knox County's failure to adequately train, supervise, and discipline the  Lt. Smith, Officer Bakker, and Officer Thomas and other correctional staff was the moving force behind the right to privacy violation Plaintiff suffered, Plaintiffs bring suit for nominal and compensatory damages pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

183.     Acting on behalf of Knox County, Sheriff Spangler ratified the unlawful actions of Lt. Smith and Officers Bakker and Thomas by implicitly finding these actions were consistent with, rather than violative, of Knox County's policies.

184.     As a direct and proximate result of Knox County's policy, practice, and custom in violation of Plaintiff's rights, Plaintiff suffered damages, including severe humiliation and emotional distress.

185.     Plaintiff sues the County for violating his constitutional rights, and seeks any and all damages allowable, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT SEVEN

## BATTERY

### (Against the County, Lt. Smith, Individually, and Officers Bakker, Thomas, and Thornbury, Individually)

186.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

187.     The jerking, slamming, kneeing, tasing, punching, and takedown of Plaintiff by Lt. Smith and Officers Bakker, Thomas, and Thornbury, acting under color

-45-

of law and in the course and scope of their employment for the County and KCSO, constitutes a battery.

188. As a direct and proximate result of the actions of Lt. Smith, Lt. Miller, and Officers Bakker, Thomas, and Thornbury, Plaintiff suffered bodily injuries and severe pain and suffering. They had no legal justification for using force against Plaintiff, and the uses of force by Lt. Smith and Officers Bakker, Thomas, and Thornbury, while carrying out their duties was unreasonable under the circumstances. As such, the jerking, slamming, tasing, and punching of Plaintiff all constituted battery under Tennessee law.

189. The foregoing acts proximately caused the injuries to Plaintiff, entitling Plaintiff to recover compensatory damages from the County and Lt. Smith and Officers Bakker, Thomas, and Thornbury. Said damages include, but are not limited to, the tremendous pain and suffering Plaintiff suffered.

190. The conduct of Lt. Smith and Officers Bakker, Thomas, and Thornbury was malicious, wanton, oppressive, and accomplished with a conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**COUNT EIGHT**

**COMMON LAW INVASION OF PRIVACY**

**(Against the County, Lt. Smith, Officer Bakker,
and Officer Thomas, Individually)**

191. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

-46-

192.     Even as an inmate in the Detention Facility, Plaintiff had a reasonable expectation of privacy.

193.     After causing the Plaintiff to stripped completely naked in the medical unit, Lt. Smith and Officers Bakker and Thomas periodically opened the entry-door to the unit, allowing anyone who passed by the door to see Plaintiff, unreasonably exposing Plaintiff's genitals to countless officers, medical staff, inmates, and others.

194.     Plaintiff did not authorize or give his consent to the unwarranted invasion of his individual privacy.

195.     Defendants' intrusion of his privacy was intentional.

196.     Defendants' intentional intrusion on his privacy rights was substantial and highly insulting, as the average person would find the exposure of their completely naked bodies, including their uncovered genitals, to be extraordinarily offensive.

197.     Defendants' intentional intrusion on Plaintiff's privacy rights would cause a person of ordinary sensibilities to suffer mentally, to be shamed, and to be humiliated.

198.     Plaintiff was outraged and suffered mental suffering, shame, and humiliation, entitling Plaintiff to an award of punitive damages.

## COUNT NINE

## NEGLIGENCE

### (Against the County and All Individual Defendants, Individually)

199.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

200.    Defendants had a duty to Plaintiff to act with ordinary care and prudence so as not to cause him harm or injury.

201.    The actions of Defendants were negligent and reckless, including but not limited to:

> ▪ recklessly jerking Plaintiff out of his bunk, causing him to hit his head hard, and kneeing him in the back (Officer Thornbury);
>
> ▪ the reckless use-of-force against Plaintiff by Tasers (Lt. Smith and Officer Bakker);
>
> ▪ punching Plaintiff in the head and kneeing him in the back (Officer Thomas);
>
> ▪ pepper-spraying/macing Plaintiff and/or grabbing his arms, hands, legs, feet, and head and holding him down to be Tased and beaten (Lt. Smith, Officer Bakker, and Officer Thomas); and
>
> ▪ refusing to give Plaintiff aid for the burning and pain caused by the pepper-spray or mace on his face and in his eyes, mouth, and nose unless he answered questions correctly (Lt. Miller).

202.    Defendants owed a duty to the public in general and specifically to Plaintiff to use due care in fulfilling their duties and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards. As described above, Defendants breached their duties of due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

-48-

203.    Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Plaintiff a duty of care to be free from excessive force and to protect him from injury.

204.    As a direct and proximate result of Defendants' conduct, as alleged above, and other undiscovered negligent conduct, Plaintiff was caused to suffer bodily injuries and severe pain and suffering.

205.    The foregoing acts of the Defendants proximately caused the injuries to Plaintiff, entitling him to recover compensatory damages from Defendants for such damages. Said damages include, but are not limited to, bodily injuries and the tremendous pain and suffering Plaintiff endured.

## COUNT TEN

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Against All Individual Defendants, Individually)

206.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

207.    The actions alleged above against the Individual Defendants were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

208.    From the moment Officer Thornbury jerked the defenseless Plaintiff out of his bunk to take him to the medical unit, the Individual Defendants, starting with Officer Thornbury, unnecessarily and unreasonably escalated a simple body-cavity search into a situation involving a great violation of Plaintiff's right to privacy and a

-49-

serious risk of bodily harm, which culminated in Plaintiff being repeatedly tased, punched in the head, maced or pepper-sprayed, took down to the floor by as many as eight corrections officers, and kept in five-point restraints in a chair for several hours – and with a mask over his head that hindered his ability to breathe freely. One Defendant, Lt. Miller, also refused to provide Plaintiff with any aid, *i.e.*, eye drops, to help the burning and pain in Plaintiff's eyes until Plaintiff answered his questions to Lt. Miller's satisfaction.

209.    The Individual Defendants' conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish on Plaintiff.

210.    The aforementioned acts were done knowingly, intentionally, and maliciously, for the purpose of oppression and inflicting injury upon Plaintiff, and in reckless, wanton and callous disregard of his safety, security, and civil rights. By reason thereof, Plaintiff claims compensatory damages of $1,000,000 as well as punitive damages of $2,500,000 (or in an amount to be proven at trial) sufficient to punish and deter the Individual Defendants and others in similarly situated positions of authority from engaging in similar conduct in the future.

211.    The County is also liable to Plaintiff under Tenn. Code Ann. § 8-8-301, et seq.

## VII.   JURY DEMAND

212.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

-50-

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.      That Defendants be served with a copy of this Complaint and be required to answer;

B.      That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.      That Plaintiff be awarded such damages as will fully compensate him for all injuries proximately caused by Defendants' actions and that a judgment in his favor be entered;

D.      That Plaintiff be awarded $1,000,000 in compensatory damages;

E.      That Plaintiff be awarded $2,500,000 in punitive damages;

F.      That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.      That Plaintiff be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 3rd day of November, 2020.


*/s/ Lance K. Baker*
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

-51-

Joshua D. Hedrick, Esq.
**WHITT, COOPER, HEDRICK**
  **& WOJCIK**
607 Market Street, Suite 1100
Knoxville, TN 37902
Tel: (865) 518-7073
hedrick@knoxdefense.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2020, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Lance K. Baker*
Lance K. Baker
