UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

BRADLEY ERWIN EASTERLY,                  )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )          No. 3:20-CV-00065-JRG-HBG
                                         )
OFFICER LANCE THOMAS, OFFICER            )
KRIS THORNBURY, OFFICER ADAM             )
BAKKER, LT. MILLER, LT. JOSH             )
SMITH and KNOX COUNTY                    )
MUNICIPALITY,                            )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION AND ORDER

This is a prisoner's action for violation of 42 U.S.C. § 1983 and Tennessee law arising out

of a series of incidents on March 14, 2019, during his confinement in the Knox County Detention

Facility [Doc. 30]. Now before the Court are Defendants' motion for the Court to determine

whether to place the video footage of a cavity search of Plaintiff under seal [Doc. 40], Defendants'

motions to dismiss the complaint pursuant to Rule 12(b)(6) [Docs. 41, 42], and Defendants'

motions for a protective order and an order to stay all discovery [Docs. 58, 68]. The Court will

address these motions in turn based on the substance thereof.

## I.    SEAL VIDEO FOOTAGE

First, in support of their motions to dismiss, Defendants filed a USB drive that includes

body camera video footage ("Body Cam Footage"), a video clip from the Body Cam Footage, and

a two-hour, ten minute, and fifty-nine second video of Plaintiff in a restraint chair [Doc. 39].

Defendants have also filed a motion for the Court to determine whether to keep the Body Cam

Footage and video clip under seal [Doc. 40]. In this motion, Defendants note that the Body Cam

Footage and video clip show Plaintiff unclothed and state that while Plaintiff, through counsel, refused to join in the motion, Defendants do not oppose the Court filing the Body Cam Footage and video clip under seal [Doc. 40 at 1–2]. Plaintiff did not file a response to this motion.

Under Local Rule 26.2(b), "[c]ourt records . . . shall not be placed under seal" without a showing of good cause. E.D. Tenn. LR 26.2(b); *Phibbs v. Rev. Recovery Corp.*, No. 3:16-cv-156-TWP-HBG, 2017 WL 10439789, at *1 (E.D. Tenn. May 8, 2017) (noting that "[i]n this District, discrete redacting of documents or selective sealing is generally preferred over the wholesale sealing of a document"). The Sixth Circuit has also recognized a "'strong presumption in favor of openness'" of court records. *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983)). The party seeking to seal court records therefore bears a "heavy" burden of overcoming this presumption, and "'[o]nly the most compelling reasons can justify non-disclosure of judicial records.'" *Id.* at 305 (quoting *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983)).

Due to the nature of portions of the Body Cam Footage and the video clip, which the Court has reviewed and will summarize as accurately as possible below to the extent that they may be relevant to Plaintiff's claims, Defendants' motion for the Court to determine whether to keep the Body Cam Footage and video clip under seal [*Id.*] will be **GRANTED** to the extent the Clerk will be **DIRECTED** to keep these filings [Doc. 39, Body Cam Footage and Video Clip[1]] under seal.

---

[1] As Defendants do not cite the video of Plaintiff in the restraint chair that they filed with the Body Cam Video and the video clip [Doc. 39] in their motion to seal or their motions to dismiss [Docs. 40, 41, 42], it is unclear whether they intended to file it. But if Defendants filed the restraint chair video under seal by filing it on the same USB drive with the other materials, the Court sees no reason for this video, which the Court has reviewed, to be under seal. Accordingly, the Clerk will be **DIRECTED** to ensure that the restraint chair video is not under seal.

2

*Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179 (providing that a Court may file things under seal to protect "certain privacy rights of participants," among other things).

## II.    MOTIONS TO DISMISS

Both Defendant Knox County and the individual Defendants have filed motions to dismiss Plaintiff's claim on various grounds [Docs. 41, 42].  Plaintiff filed responses in opposition to these motions [Docs. 48, 49], and Defendants filed replies [Docs. 54, 55].  With the Court's permission [Doc. 73], Plaintiff filed sur-replies [Docs. 74, 75].

The Court will first summarize the applicable standard of review, Plaintiff's factual allegations in support of his claims in his amended complaint, and the relevant materials Defendants have filed in support of their motions to dismiss, before addressing the substance of Defendants' motions to dismiss and the related motions.

### A.    Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679.  When considering a motion to dismiss, all factual allegations in the complaint must be taken as true. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

3

"But a court deciding a motion to dismiss may consider 'other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.'" *Hancock v. Miller*, 852 F. App'x 914, 919–20 (6th Cir. 2021) (citing *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) and *McLaughlin v. CNX Gas Co., LLC*, 639 F. App'x 296, 298 (6th Cir. 2016)). Also, "when videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted by the videotape; rather it should view the facts in the light depicted by the videotape.'" *Cunningham v. Shelby Cty.*, 994 F.3d 761, 763 (6th Cir. 2021)

### B.    Amended Complaint Allegations

Plaintiff's amended complaint is fifty-six pages long, and it is the operative complaint for purposes of the pending motions to dismiss [Doc. 30]. In this pleading, Plaintiff sets forth his factual allegations in three separate sections. Specifically, Plaintiff first summarizes his factual allegations in five pages of numbered paragraphs under the heading "Nature of Action" [Doc. 30 at 4–9]. The amended complaint also includes a thirteen-page section of numbered factual paragraphs under the heading "Factual Allegations" [*Id.* at 12–25], as well as a twenty-seven-page section labelled "Claims for Relief," which includes sub-headings and numbered paragraphs containing factual and/or legal allegations to support each claim for relief [*Id.* at 26–53].

However, the three separate sections of the amended complaint that include factual allegations do not include the same factual allegations. Specifically, Plaintiff phrases his factual allegations differently in these three sections and sometimes appears to modify them from section to section,[2] and the "Claims for Relief" section includes and/or references some, but not all, of the

---

[2] For example, Plaintiff states in his "Nature of Claims" and "Factual Allegations" sections that Defendant Lt. Smith, Defendant Officer Bakker, Defendant Officer Thomas, and Brandon Hemphill were present in the medical unit exam room when he arrived there [*Id.* at 4, 14] but

factual allegations included in the "Nature of Action" and "Factual Allegations" sections [Compare *id.* at 4–9 with *id.* at 12–25 with *id.* at 26–53].

Accordingly, the Court considers only the facts Plaintiff included or referenced in his counsel-filed amended complaint under the heading "Claims for Relief" as those on which he relies to support each of his claims under the relevant sub-headings and will reference the facts he included in his "Factual Allegations" section only to the extent they provide context to the allegations he clearly references or includes in the claim's sub-heading in the "Claims for Relief" section. In other words, the Court will not search the amended complaint, which counsel filed, for other factual allegations that may support Plaintiff's claims but that he does not include or reference in the relevant claim sub-heading in his "Claims for Relief" section. The Court will summarize these factual allegations before summarizing the relevant materials Defendants filed in support of their motions to dismiss, where they may be relevant to Plaintiff's claims.

### 1. Claim One – Excessive Force Against Defendant Officer Thornbury

#### a. Plaintiff's Allegations

Plaintiff's first claim is for excessive force against Defendant Thornbury [*Id.* at 26–28], and it arises out of his allegation that on March 14, 2019, while he was confined in the Knox County Detention Facility waiting for a hearing on a parole violation and a trial on other charges, Defendant Officer Thornbury banged on his cell door, waking him up [*Id.* at 13]. After Defendant Officer Thornbury ordered Plaintiff's cell mate to get on the floor, this Defendant ordered Plaintiff to get on his stomach on the floor [*Id.*]. Plaintiff started to comply, but before he could do so, Defendant Officer Thornbury "grabbed Plaintiff's left arm and jerked him violently off the top

---

alleges in his "Claims for Relief" section that "he was met by a contingent of up to eight officers" in that room [*Id.* at 29].

bunk onto the floor" in a manner that caused Plaintiff to hit the back of his head, which dazed him and caused him "great pain" [*Id.*]. Then, when Plaintiff was on his stomach, Defendant "Officer Thornbury struck Plaintiff's lower back and kidney hard with his knee, and cuffed him," all while Plaintiff did not resist this Defendant [*Id.*]. After this incident, Plaintiff had headaches and a lump on his head, and he was nervous and often unable to sleep due to fear that officers would come to his cell and jerk him out of bed in his sleep [*Id.*]. According to Plaintiff, Defendant Thornbury's use of force in this event was "unnecessary and gratuitous" and "clearly excessive and unconstitutionally disproportionate to the circumstances" [*Id.* at 27].

Plaintiff alleges that Defendant Thornbury used excessive force in violation of his rights under the Eighth Amendment in this incident and this "caused Plaintiff to suffer (a) bodily injuries, (b) excruciating pain and suffering, and (c) severe emotional suffering and mental anguish, despair, and hopelessness" [*Id.* at 27–28]. Plaintiff claims that he is entitled to punitive damages due to the nature of this claim and seeks "any and all damages allowable" for this claim, as well as attorney fees, costs, and discretionary costs [*Id.* at 28].

### b. Relevant Materials Filed in Support of Defendants' Motion to Dismiss

Documents filed with Defendants' motion to dismiss establish that, as a result of this incident, Plaintiff was found guilty of a jail disciplinary infraction for physically resisting an officer, the jail disciplinary hearing officer recommended that Plaintiff lose eight behavior credits as a result of this finding of guilt, and, on March 21, 2019, Captain Cox approved this recommendation [Doc. 38-1 at 24–27].

Also, in support of their motions to dismiss, Defendants filed a grievance from Plaintiff in which he references this incident by stating that "on 3-14-19 I was jerked from my bunk and taken to medical for a 'strip search'" [Doc. 38-2 at 1]. This grievance then goes on to set forth a number

6

of factual allegations regarding events after Defendant Officer Thornbury took Plaintiff from his cell, which he states amounted to excessive force and should not have been videotaped or "shown to the police force," and he urges the grievance chairperson to "watch the tape!" [*Id.* at 1–2].

### 2. Claim Two - Excessive Force Against Defendants Lt. Smith, Officer Thomas, and Officer Bakker

#### a. Plaintiff's Allegations

Plaintiff's second claim alleges that Defendants Lt. Smith, Officer Thomas, and Officer Bakker used excessive force against him in violation of the Eighth Amendment [*Id.* at 28–32]. Specifically, Defendant Thornbury took Plaintiff from his cell to a room medical unit room "for what appears to have been a strip or cavity search, unless [] Plaintiff agreed to remove whatever contraband he had by his own hand" [*Id.* at 29]. Plaintiff first alleges that Defendant Lt. Smith, Defendant Officer Bakker, Defendant Officer Thomas, and Brandon Hemphill were in this room when he arrived [*Id.* at 14] before alleging that "up to eight officers" were there and "presumably armed with Tasers, pepper-spray or mace, and other less-deadly or non-deadly weapons" [*Id.*]. "Officers Bakker and Thomas quickly grabbed hold of Plaintiff by his arms and shoulders, as Lt. Smith stood two or three steps behind him with his Taser drawn and the red laser-beam sight fixed on Plaintiff's mid-lower back" [*Id.* at 29].

Defendant Lt. Smith "quickly decided to escalate the situation into a physical confrontation by tasing Plaintiff, just as Plaintiff was doing exactly as Lt. Smith commanded, i.e., reaching his left hand behind him to remove something from his buttocks" [*Id.*]. Plaintiff states that Defendant Lt. Smith tased him multiple times, that physical force to compel him to remove the bag of contraband was unnecessary, that he did not threaten any officers, and that this tasing was "merely to enforce an order to remove the plastic bag, not to protect officers or other inmates" [*Id.* at 31].

Plaintiff states the video footage of this incident shows that he tried to swat away the taser wires and probes, which he claims was "by reflex," while the taser can still be heard, and that an "officer t[old] Plaintiff to get down" [*Id.* at 18]. Plaintiff further asserts that he then convulsed and "reflexively tried to defend himself from further injury and abuse," at which point Defendant Lt. Smith "drive-stunned" Plaintiff by pulling the trigger on the taser while it was placed on his thigh, Defendant Officer Bakker grabbed him from behind, and Defendants Officer Bakker, Lt. Smith, Officer Thomas, and other officers "force[d] Plaintiff onto the floor face-first"[3] [*Id.* at 19, 29]. Plaintiff states that he told officers "get off me" and "cut it out" and screamed and moaned in pain [*Id.* at 19].

Plaintiff asserts that the video shows that Defendant Officer Thomas then repeatedly punched him in the head and face while "other officers [we]re twisting and turning Plaintiff's limbs and groping him" [*Id.* at 19, 29–30].[4] Plaintiff also states that the video shows that while other officers held him down, Officer Bakker "repeatedly drive stun[ned] Plaintiff by placing a Taser against his right hip and torso, as the Taser probes are seen imbedded in Plaintiff's bare back, and as he was tased again by Officer Bakker. Plaintiff can be heard screaming in pain" [*Id.* at 20, 29].

_____

[3] In his description of this portion of the incident in the "Factual Allegations" portion of his complaint, Plaintiff acknowledges that Defendant Lt. Smith stated in his incident report that his initial use of the taser had little effect on Plaintiff and that Plaintiff then "began to 'resist all control' and try to remove the taser probes" [Doc. 38-1 at 13], but he insists that the video footage contradicts these statements, stating that "[t]here is no evidence whatsoever that Plaintiff actively resisted the officers prior to getting repeatedly tased, drive-stunned, punched, and kneed by Lt. Smith and Officers Bakker and Thomas," and that he was "convulsing and [] reflexively tried to defend himself from further injury and abuse" [Doc. 30 at 19]. Plaintiff also admits that Defendant Officer Thomas stated on the video that Plaintiff had bit him before punching him but states that the video recordings do not "show Plaintiff resisting at all" [*Id.* at 24].

[4] Plaintiff also insists in his amended complaint that while Defendant Thomas states that he used "closed fist strikes . . . to gain compliance" [Doc. 38-1 at 9], Plaintiff was already on his stomach on the floor surrounded by officers at this time [Doc. 30 at 19 n.4].

Plaintiff additionally alleges that, at some point while he was on the floor, Defendant Smith sprayed pepper spray or mace in his face [*Id.* at 30]. Plaintiff also states that, after other officers began to place restraints on his arms and legs, Defendant Thomas then "put his left knee hard on Plaintiff's head and upper back as Plaintiff was face-down on the floor being held down by as many as seven officers" [*Id.* at 20, 30].

Plaintiff alleges that Defendant Lt. Smith's act of tasing him and the acts that followed violated his rights under the Eighth Amendment and that Defendants Lt. Smith, Officer Bakker, and Officer Thomas's uses of force had no penological purpose and were only taken with the malicious intent to cause him harm [Doc. 30 at 30–31]. Plaintiff states that, as a result of this incident, he suffered "(a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness" [*Id.* at 31]. Plaintiff claims he is entitled to punitive damages due to the nature of this claim and seeks "any and all damages allowable" for this claim, as well as attorney fees, costs, and discretionary costs [*Id.* at 31–32].

### b. Relevant Materials Filed in Support of Defendants' Motions to Dismiss

In support of their motions to dismiss, Defendants filed the Body Cam Footage, a screen shot from the Body Cam Footage that they claim establishes that Plaintiff removed the drugs from his rectum during his altercation with officers, the forms from the disciplinary proceedings against Plaintiff arising out of this incident,[5] Plaintiff's grievance regarding this incident, and criminal

---

[5] In his amended complaint, Plaintiff notes that, due to the incident in the medical exam unit room, he "was written up for disciplinary infractions, which found that he had assaulted two officers and was in possession of contraband" and therefore he "was placed in solitary confinement" and lost privileges for ninety days [*Id.* at 24]. Plaintiff also notes that he faced criminal charges for assault and for bringing contraband into a penal facility and pled guilty to some drug charges arising from this incident, but his charges for assault were dismissed [*Id.* at 25].

9

court documents and a transcript from a hearing in criminal court where Plaintiff pled guilty to various charges arising from this incident [Docs. 38-1, 38-2, 38-3, 38-4, 39].

First, the jail forms regarding the disciplinary proceedings against Plaintiff for this incident show that (1) Plaintiff was found guilty of two jail disciplinary infractions for assault on an officer, one count of possession or use of dangerous contraband, and one count of "resisting (physically)"; (2) the disciplinary hearing officer recommended that Plaintiff lose sixteen behavior credits for one of his disciplinary convictions for officer assault, in addition to losing his privileges for some time; and (3) Captain Cox approved this recommendation on March 21, 2019 [Doc. 38-1 at 1–19].

Next, in Plaintiff's written grievance regarding this incident, he states that Defendant Lt. Smith and three other officers were present when he "was told to spread his legs and cough" and to reach behind and remove a bag that officers saw "sticking out of [his] backside," and that:

> when I did not pull this item out of myself I was immediately ta[s]ed butt naked reaching behind me, I was tased THREE times, sprayed in the face, spit mask on even though I did not spit at all, and put in the restraint chair for TWO hours with the SPIT MASK smearing my tears & snot the whole two hours and burnt severely my rights side of face, then final[ly] I was able to get the drops that ease the burn from the nurse & placed in medical for a day or two . . . I strongly feel that this was excessive force, and definitely not supposed to be video taped and showed around to the police force here. I feel violated and over punished considering I showed ZERO AGGRESSION towards any officer, watch the tape! I got 90 days in the hole and several street charges [], on top of being tased, sprayed, & abused . . .

[Doc. 38-2 at 1–2].

Also, Defendants filed documents from a state court criminal proceeding showing that Plaintiff pled guilty to charges arising out of this incident, specifically "[c]ontraband in a penal facility," "[s]imple possession of methamphetamine," and "[p]ossession of drug paraphernalia" [Doc. 38-4]. They also filed a transcript from the hearing at which Plaintiff pled guilty to these charges which establishes that the factual basis for these guilty pleas included the fact that the bag of contraband at issue in this incident contained heroin, tramadol, and fentanyl [Doc. 38-3 at 7, 9].

Lastly, Defendants also filed fourteen minutes and thirty-four seconds of video footage of Plaintiff in the medical exam unit room and thereafter, and a screenshot from that footage [Doc. 39, Body Cam Footage and Screen Shot]. The first thirty seconds of the Body Cam Footage have no sound [*Id.*, Body Cam Footage, at 0:00–0:30]. In the first five seconds, Plaintiff leans forward on a medical table/bench, puts both hands on either side of his backside, and appears to pull outwards while an officer behind him, apparently Defendant Lt. Smith, leans down to look [*Id.* at 0:01–05]. Plaintiff then stands back up and turns the right side of his face towards Defendant Lt. Smith before clasping his hands behind his head and facing the wall [*Id.* at 0:05–11].

Then Plaintiff again turns the right side of his face towards Defendant Lt. Smith, at which point this Defendant shoves him forward and he briefly unclasps his hands before clasping them again [*Id.* at 0:12–17]. Plaintiff then continues to face forward with officers on either side of him, and each officer keeps one of his hands on each of Plaintiff's arms as he clasps his behind his head [*Id.* at 0:17–30]. Throughout this portion of the video, a target light from what appears to be a taser in Defendant Lt. Smith's hands is visible on Plaintiff's back [*Id.* at 0:01–30].

At approximately thirty seconds into the Body Cam Footage, the sound begins as Plaintiff is standing with officers on either side, and a third officer reaches in to grab his left shoulder as Defendant Lt. Smith states "you have a bag of drugs between your butt cheeks," to which Plaintiff responds "I do not have a bag of drugs between my butt cheeks" [*Id.* at 0:30–35]. Defendant Lt. Smith states that Plaintiff does have such a bag, that he has seen it, and that Plaintiff is "going to be given the option to reach back there and remove those drugs and drop that bag on the floor. If you do not remove those drugs . . . ," and Plaintiff interrupts and states "I do not have a bag of drugs. I've got a bag of uhhh I might have one Klonopin back there, that's it" [*Id.* at 0:36–52].

At this point, the video appears to show Plaintiff shift his weight from one leg to the other, the officers holding him immediately appear to stiffen their grips, and then, as Plaintiff turns his face to the left, another officer reaches in to hold him, two officers say "whoa," one officers says "face forward," and another says "you are getting very close to being tased" [*Id.* at 0:53–1:00]. Another officer says, "the bag is there, I can see it," an officer responds, "alright," and Plaintiff states "man, that's such bullsh*t, man" and again seems to slightly shift his weight [*Id.* at 1:00–06]. An officer then tells Plaintiff to "face forward" again, Plaintiff says, "I'm facing forward," and the officer says, "thank you, continue to do so" [*Id.* at 1:06–10].

Plaintiff next asks, "what are y'all doing?," and an officer tells him to listen to Defendant Lt. Smith's instructions, at which point this Defendant says "he's going to let go of your left hand. Reach back with that left hand, remove that baggie, and drop it to the floor. If you do anything else, I'm going to tase you, do you understand?" [*Id.* at 1:10–25]. While Defendant Lt. Smith is saying this, the officer holding Plaintiff's left wrist lets go of Plaintiff's left hand and Plaintiff brings that left hand towards his rectum [*Id.*]. As Plaintiff's left hand goes out of the bottom of the frame of the Body Cam Footage in a manner indicating that he is reaching towards his rectum at approximately 1:23 on the video timer, Plaintiff states "there's nothing there" [*Id.* at 1:23–25].

At approximately 1:27 on the video timer, after Plaintiff's hand has been out of the frame for approximately four seconds, Defendant Lt. Smith fires the taser at Plaintiff's back [*Id.* at 1:23–27]. Plaintiff tries to pull out the taser probes before falling towards the floor [*Id.* at 1:27–28]. Plaintiff then pops back up to standing position, at which point officers reach for him, he pushes their arms away, and he appears to punch the air with both of his hands [*Id.* at 1:29–31]. A scuffle ensues, and, for about forty seconds after this point of the video, officers and Plaintiff frequently obstruct the Body Cam Footage, which therefore does not show a clear view [*Id.* at 1:31–2:09].

12

But as the sound of the taser continues, at least one officer repeatedly orders Plaintiff to get on the ground [*Id.* at 1:31–38]. At this point, while Plaintiff and the officers are still struggling and it appears that officers are trying to get Plaintiff to the ground, the Body Cam Footage shows Plaintiff remove a black object from his backside and throw it on the ground [*Id.* at 1:38–40]. At approximately 1:40 on the video timer, Plaintiff appears to be on the ground, and he begins to make a high-pitched unintelligible noise while repeating "I'm down, I'm down" [*Id.* at 1:39–41].

However, the struggle between Plaintiff and officers continues [*Id.* at 1:41–2:07]. Despite the disordered nature of the struggle as shown in the Body Cam Footage, it is apparent that the taser repeatedly fires, that officers continue to yell orders at Plaintiff, who insists he is "down," and that an officer loudly states "he bit me, he bit me," and this officer appears to struggle to get his left hand away from Plaintiff's head before punching him in the head several times with his right hand [*Id.* at 1:41–57]. When this officer finally pulls his left hand away from the area of Plaintiff's head and up into the Body Cam Footage frame, the glove on that hand appears to be torn in the area of the pinky and it appears to have a red/pink substance on it [*Id.* at 1:57].

Over the next twelve seconds, Plaintiff continues to make a high-pitched sound while stating he is down, an officer holds a taser on Plaintiff's right thigh while it fires, and officers yell at Plaintiff before finally rolling him onto his stomach [*Id.* at 1:57–2:09]. After that occurs, the scene calms, and officers hold Plaintiff down and put restraints on him while an officer puts his knee on Plaintiff's back for approximately ten seconds [*Id.* at 2:09–2:19].

### 3. Claim Three – Excessive Force against Defendant Lt. Miller

#### a. Plaintiff's Allegations

Plaintiff's next claim arises out of his allegation that Defendant Lt. Miller failed to provide him with eye drops for several hours despite knowing his eyes were burning, as retribution for

13

Plaintiff not answering his questions[6] [*Id.* at 32–33]. Specifically, Plaintiff alleges that, at one point after his altercation with officers, an officer put a spit mask on him, which he alleges resulted in mace or pepper spray smearing into his eyes, mouth, and nose and caused his face to burn and him to feel like he was suffocating [*Id.* at 22]. Officers then took him to another room and strapped him into a restraint chair with the spit mask on [*Id.*]. "[A]fter about a half hour, [Defendant] Lt. [] Miller came into the room and told Plaintiff that he might get some eye drops for him and unstrap him from the chair, but that depended on how Plaintiff answered some questions for him" [*Id.* at 23]. This Defendant then asked Plaintiff how many "strips" and how many Klonopin were in the bag of drugs, Plaintiff told him that a doctor had prescribed the suboxone and Klonopin, and "Lt. Miller said he would verify this information and left the room" [*Id.*]. Plaintiff then sat in the restraint chair "for several hours, suffocating from the mask over his face, unable to use his hands to wipe away the chemicals in his eyes, mouth, and nose, while still in pain from the repeated shocks caused by the repeated tasing, and bleeding from his rectum" [*Id.*]. Eventually, Plaintiff was taken to the medical unit and received drops for his burning eyes [*Id.*].

Plaintiff alleges that Defendant Lt. Miller violated his rights under the Eighth Amendment in this incident by unnecessarily and wantonly inflicting pain on him in a manner that had no penological purpose and was "tantamount to torture" and maliciously intended to cause Plaintiff harm [*Id.* at 32–33]. Plaintiff further asserts that this incident caused him "to suffer (a) bodily injuries, (b) excruciating pain and suffering, and (c) severe emotional suffering and mental anguish, despair, and hopelessness" [*Id.* at 27–28]. Plaintiff claims that he is entitled to punitive

---

[6] In their motion to dismiss, the individual Defendants state that Plaintiff also accuses Defendant Bakker of "placing or leaving Mr. Easterly in the restraint chair" [Doc. 42 at 18]. However, Plaintiff only asserts this claim against Defendant Miller [Doc. 30 at 32–33].

14

damages due to the nature of this claim and seeks "any and all damages allowable" for this claim, as well as attorney fees, costs, and discretionary costs [*Id.* at 28].

> **b.    Relevant Materials Filed in Support of Defendants' Motion to Dismiss**

In the video footage Defendants filed with their motions to dismiss [Doc. 39, Body Cam Footage], an officer begins to put a spit mask on Plaintiff when the timer reads approximately 7:07 [*Id.* at 7:07–7:20]. Plaintiff immediately complains that he cannot breathe [*Id.* at 7:20–7:40]. Then, at approximately 8:14, officers begin to walk Plaintiff into the hallway, at which point an officer tells Plaintiff to face the wall and he responds by stating three times that he "can't see nothing" [*Id.* at 8:23–39]. Subsequently, as officers lead him into a separate room, it sounds like Plaintiff states "I can't see out of my eyes, can y'all get this out of my eyes, please? I can't see nothing . . . I can't see nothing, can y'all get this out of my eyes, please?" [*Id.* at 9:19–9:33].

Then, in the restraint chair, Plaintiff again says "please y'all, will you please get this out of my eyes?" [*Id.* at 9:33–37]. Plaintiff again states "please get this out of my eyes, please get this out of my eyes . . . . it's burning, it's burning, it's burning, it's burning bad y'all," to which an officer responds, "it's supposed to," and Plaintiff replies, "I know but golly" [*Id.* at 9:44–9:56]. Also, about thirty seconds later, Plaintiff complains about his eyes and states that his nose is "killing me" [*Id.* at 10:30–42]. Plaintiff asks that officers remove the spit mask to allow him to breathe better, states that he will not spit on them, and states that the mask is making the chemicals "burn my whole face," and an officer responds "it will burn your whole face" [*Id.* at 10:50–11:11]. A few seconds later, Plaintiff again asks to remove the mask, states that he will not spit on them, and asks for somewhere else to spit [*Id.* at 11:16–11:28]. Plaintiff then twice asks that officers take his mask off, and an officer tells him, "no matter how many times you ask, the answer is going to be no for the time being," Plaintiff asks "for how long?," and it sounds like the officer responds

15

"that is yet to be determined" [*Id.* at 11:40–11:50]. Plaintiff then asks several times for someone to pull his mask up, but no one appears to answer [*Id.* at 12:51–13:28].

At approximately 13:55 on the video, a nurse enters the room and begins checking Plaintiff's restraints, and he immediately asks her to take off his mask and states "it's burning so bad" [*Id.* at 13:55–14:03]. An officer states that they are going to remove his spit mask and wash out his eyes, and Plaintiff says "thank you so much, man" [*Id.* at 14:08–14:14]. After the nurse states that she is ready to wash out Plaintiff's eyes while holding a blue and white bottle, officers begin to lift the spit mask off Plaintiff's head, and the video footage briefly shows the hallway outside of the restraint chair room before it ends [*Id.* at 14:14–31].[7]

### 4. Claim Four – Violation of Right to Privacy against Defendants Smith, Bakker, and Thomas

#### a. Plaintiff's Allegations

Plaintiff next claims that Defendants Lt. Smith, Officer Bakker, and Officer Thomas forcibly stripped him naked in the medical unit room while they and others periodically opened the door to a "long, busy hallway where countless people wandering by and looking on," all under Defendant Lt. Smith's supervision [*Id.* at 34]. Plaintiff specifically claims that this forced him to expose his genitals to male and female strangers, who had an "unobstructed view of him" when the door was open, that "countless people," including a female who removed the taser probes from his back, accessed the room, that no exigent circumstances or penological purpose compelled

---

[7] Further video footage from the restraint chair room that Defendants filed in support of their motions to dismiss shows that the nurse uses the blue and white bottle to pour something over Plaintiff's eyes [Doc. 39, Restraint Chair Video 5:49–7:07]. However, as set forth above, Defendants do not cite this video in support of their motions to dismiss and it is unclear if Defendants intended to file it.

16

Defendants to perform this search within view of others, and that it was clearly established that performing this search under these conditions would violate his privacy rights [*Id.* at 35–38].

Plaintiff further asserts that he endured severe emotional pain and suffering, humiliation, and emotional distress as a result of this incident, and he seeks "any and all damages," including punitive damages, as well as attorney fees, costs, and discretionary costs [*Id.* at 38–39].

### b. Relevant Materials Filed in Support of Defendants' Motion to Dismiss

The first minute and twenty-seven seconds of the video footage of Plaintiff's body-cavity search shows Plaintiff in a room with no clothes on and his back to the camera while facing a blue medical bed/bench [Doc. 39 at :01–1:27]. Defendant Miller then tases Plaintiff, and Plaintiff and officers engage in a struggle for the next forty seconds before officers secure Plaintiff on his stomach on the ground with a number of officers around him [*Id.* at 1:27–3:39].

At approximately 3:39 on the video footage, the door to the room opens, and it appears to be directly behind where Plaintiff was facing the medical bed/bench [*Id.* at 3:39–3:58]. While the door is open, two male officers leave and a woman enters [*Id.*]. The woman begins removing the taser probes from Plaintiff's back at approximately 4:09 on the video, and it takes her about nineteen seconds to complete this task [*Id.* at 4:09–4:28]. During this time, another officer opens the room door and enters [*Id.* at 4:09–14]. Also, after the woman has removed the probes, another officer opens the door, and the woman and at least one other officer exit [*Id.* at 4:28–4:44]. An officer then puts pants on Plaintiff [*Id.* at 4:44–6:11].

### 5. Claim Five – Failure to Train and Supervise Regarding Use of Force Against Knox County

Plaintiff's next claim arises out of his allegation that Defendant Knox County failed to properly train and supervise officers regarding uses of force against inmates [*Id.* at 39]. In support

of this claim, Plaintiff states that Sheriff Tom Spangler of the Knox County Sheriff's Office ("KCSO") "has final authority and makes policy for the KCSO in establishing and implementing policies and/or procedures with respect to the use of force by deputies against inmates and the legal limits of such activities" by KCSO deputies [*Id.*]. Plaintiff then states that "the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of force are so patently obvious that [Defendant Knox] County and Sheriff Spangler are liable under § 1983" [*Id.* at 40]. Plaintiff specifically alleges that the following acts of Defendants "demonstrate such obvious and egregious training and supervisory deficiencies to make KCSO's use of force training constitutionally defective":

1. Defendant Officer Thornbury's alleged uses of force in "jerking" Plaintiff from his bunk, which resulted in Plaintiff hitting his head, and in kneeing Plaintiff when he was not resisting;

2. Defendant Smith's "unnecessary and repeating tasing of Plaintiff" and Defendant Bakker's "drive-stunning of Plaintiff" which he alleges "escalated a body-cavity search into a full-fledged violent confrontation" even though he "offered only passive resistance, if any";

3. Defendant Thomas's "unnecessary and repeated punching of Plaintiff . . . when Plaintiff was surrounded and held down on the floor by numerous officers, offering little resistance, if any";

4. Defendant Lt. Smith's "unnecessary macing/pepper spraying of Plaintiff . . . while he was subdued by numerous officers and had offered only passive resistance, if any"; and

5. Defendant Lt. Miller's acts of "forcing Plaintiff to be masked and restrained in a five-point restraint chair for several hours after being maced/pepper-sprayed and refusing to provide him any aid from the burning in his eyes, mouth, nose and on his face[.]"

[*Id.*]. Plaintiff then claims that Sheriff Spangler "established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding the use of force by

KCSO corrections officers against inmates, which policies and procedures themselves violate federal constitutional law" [*Id.* at 41].

Plaintiff also asserts that, even if the applicable KSCO policies and procedures do not violate federal law, KCSO has and had, during the relevant time period, "a persistent and widespread practice among KCSO corrections officers of using excessive force on a subject when it is unnecessary and objectively unreasonable as a matter of law to do so, amounting to a custom or course of conduct so widespread as to become informal KCSO policy" [*Id.*]. Plaintiff further states that Sheriff Spangler and Defendant Knox County "have known or have had constructive knowledge of this widespread and consistent practice of violations, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations," and that they:

1. Lack or have "an inadequate mechanism for identifying or tracking unconstitutional uses of force;"

2. Lack or have "inadequate documentation of individual uses of force, and the justification for such;"

3. Lack or have "inadequate supervisory review of documentation of individual uses of force and the justification for such;"

4. Lack or have an "inadequate mechanism for monitoring or tracking uses of force;"

5. "[L]ack [] unbiased investigation of complaints of improper uses of force;"

6. Lack or have "inadequate training regarding the legal limitations on the permissible use of force;" and

7. Lack or have "inadequate discipline of individual officers found to have committed unlawful uses of force."

[*Id.* at 41–42].

Plaintiff then claims that unconstitutional uses of excessive force like those he alleges in his complaint "are the known or obvious consequences of either formal County or KCSO polices and procedures that violate federal law, or of a widespread and persistent practice and custom of

19

such violations to which Sheriff Spangler and the County have acquiesced or have tacitly authorized" [*Id.* at 42]. Additionally, Plaintiff asserts that the acts and omissions of Sheriff Spangler and Defendant Knox County he has identified "reflect deliberate indifference on the part of Sheriff Spangler and the County to such known or obvious consequences of their actions and omissions," and that the widespread violations of inmate constitutional rights that Sheriff Spangler and Defendant Knox County condoned "were the moving force behind—and directly or proximately caused—the violations of Plaintiff's constitutional rights and render the County liable" [*Id.*]. Plaintiff further claims that Defendant Knox County, KCSO, and Sheriff Spangler "failed to train and supervise [] corrections officers to avoid using excessive force, failed to meaningfully investigate allegations of such force, and attempted to conceal unconstitutional conduct by failing to conduct transparent investigations, and by unreasonably exonerating officers [like the individual Defendants] through sham investigations or no investigation at all" [*Id.* at 43].

Plaintiff also states that Defendant Knox County, KCSO, and Sheriff Spangler had a duty to ensure that officers "were properly trained in the appropriate procedure for using force against inmates" and "the limits of their authority to use force," a duty to "properly supervise KCSO officers and insure KCSO supervisory officers did not condone [] unnecessary uses of force," and Plaintiff states that "[t]his is especially true when there is (a) a 'likelihood that [a] situation will recur' (b) with such a 'high degree of predictability' that 'an officer lacking specific tools to handle that situation will violate citizens' rights'" [*Id.*].

According to Plaintiff, "[o]fficers must have specific training to be equipped to properly react to situations, as in this case, without unnecessarily escalating them to force situations" [*Id.*]. Also, the individual Defendants "lacked the tools that the County, KCSO, and Sheriff Spangler should have provided them to safely handle the recurring situation, resulting in escalation of a

20

routine body-cavity search" [*Id.* at 44]. Further, Plaintiff avers that Sheriff Spangler's failure to conduct a meaningful investigation into the individual Defendants' actions establishes that he condoned unreasonable uses of force and ratified and "knowingly acquiesced in the unconstitutional conduct" of the individual Defendants, and that this "all but 'green light[s]' Eighth Amendment violations by KCSO deputies" [*Id.*]. Plaintiff specifically asserts that the individual Defendants "believed their actions would not be properly monitored or corrected by supervisory officers and would be tolerated and accepted. Their belief was prescient" [*Id.*].

Plaintiff states that as a result of these actions of Defendant Knox County causing violations of his Eighth Amendment rights, he has "suffered (a) bodily injuries; (b) excruciating physical pain and suffering; and (c) severe emotional suffering and mental anguish, despair, and hopelessness" [*Id.* at 45]. Plaintiff seeks "any and all damages allowable" for this claim, as well as attorney fees, costs, and discretionary costs [*Id.*].

### 6. Claim Six – Failure to Train and Supervise Regarding Privacy

Plaintiff next claims that Defendant "Knox County failed to adequately train, supervise and discipline correctional officers sufficient to prevent exposure of naked inmates in their custody to members of the opposite sex and other strangers unless absolutely necessary" and "failed in its duty to train correctional officers to properly conduct strip searches in a place and manner that does not violate [an] inmates' clearly established privacy rights" [*Id.* at 45]. In the alternative, he claims that this Defendant "through its policymaker, Sheriff Spangler, implicitly ratified the unconstitutional actions of the Individual Defendants by refusing to discipline them, thus confirming their actions in exposing [his] naked body and genitals" to male and female officers and others "were consistent with, and, indeed, pursuant to, Knox County's policy" [*Id.* at 46].

21

Plaintiff specifically claims that Defendant Knox County's "failure to train, supervise, and discipline its correctional officers was the moving force behind the invasion of Plaintiff's right to privacy under the Fourth Amendment," that Defendant "Knox County acted with deliberate indifference to Plaintiff's privacy right under the Fourth Amendment [through] its failure to train and supervise its correctional officers," and that, when the invasion of Plaintiff's privacy occurred, "there was an obvious need to train and supervise KCSO correctional officers because it is within their job responsibility to conduct strip/cavity searches, which are inherently invasive and would foreseeably result in privacy violations without adequate training and supervision" [*Id.*].

With his claim that Defendant Knox County failed to properly train and supervise its officers regarding inmate privacy, Plaintiff includes a sub-claim alleging that he learned from at least one officer that this Defendant has used videos of his strip-search and the ensuing altercation in its corrections officer training [*Id.* at 47]. Plaintiff states that this is a constitutional violation, as the videos "depict [him] in a state of complete and utter nakedness, being held down, groped, repeatedly tased, punched, hit with a knee by as many as eight officers" [*Id.* at 47].

Plaintiff further states that, as a result of Defendant Knox County's failure to properly train and supervise its officers regarding inmate privacy, he suffered "severe humiliation and emotional distress" [*Id.* at 48]. He sues this Defendant "for nominal and compensatory damages" for this constitutional violation and seeks "any and all damages allowable" for this claim, as well as attorney fees, costs, and discretionary costs [*Id.*].

### 7. Claim Seven – Battery Against Defendants Knox County, Lt. Smith, Officer Bakker, Officer Thomas, and Officer Thornbury

In Claim Seven, Plaintiff states that "[t]he jerking, slamming, kneeing, tasing, punching, and takedown of Plaintiff by Lt. Smith and Officers Bakker, Thomas, and Thornbury, acting under color of law and in the course and scope of their employment for the County and KSCO, constitutes

a battery" under Tennessee law [*Id.* at 49]. Plaintiff further asserts that, as a result of these actions, which Defendants unreasonably took without legal justification, he "suffered bodily injuries and severe pain and suffering" for which he seeks compensatory and punitive damages [*Id.*].

### 8. Claim Eight – Common Law Invasion of Privacy Against Defendants Knox County, Lt. Smith, Officer Bakker, and Officer Thomas

Plaintiff next claims that Defendants intentionally invaded his reasonable expectation of privacy without his consent by causing Plaintiff to strip completely naked in a room in the medical unit and periodically opening the door to the room, which allowed anyone who passed by the door to see Plaintiff and "unreasonably expos[ed] Plaintiff's genitals to countless officers, medical staff, inmates and others" in a manner that was "substantial and highly insulting" [*Id.* at 50]. According to Plaintiff, an average person would find such exposure "to be extraordinarily offensive" and such exposure would cause "a person of ordinary sensibilities to suffer mentally, to be shamed, and to be humiliated" [*Id.*]. Plaintiff states that he "was outraged and suffered mental suffering, shame, and humiliation," and that this entitles him to punitive damages [*Id.*].

### 9. Claim Nine – Negligence Against All Defendants

Plaintiff's next claim is that all Defendants had a duty to Plaintiff and others "to act with ordinary care and prudence" and to "ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards" but breached that duty by acting in a manner that was "negligent, grossly negligent, reckless, willful, and wanton" [*Id.* at 50–51]. Plaintiff specifically alleges that the following acts were negligent and reckless:

1. Defendant Officer Thornbury "recklessly jerking Plaintiff out of his bunk, causing him to hit his head hard, and kneeing him in the back";

2. Defendant Lt. Smith and Officer Bakker's "reckless" use of tasers against him;

3. Defendant Officer Thomas punching him in the head and kneeing him in the back;

23

4.      Defendants Lt. Smith, Officer Bakker, and Officer Thomas's acts of "pepper-spraying/macing Plaintiff and/or grabbing his arms, hands, legs, feet, and head and holding him down to be Tased and beaten. . . ."; and

5.      Defendant Lt. Miller's refusal "to give Plaintiff aid for the burning pain caused by the pepper-spray or mace on his face and in his eyes, mouth, and nose unless he answered questions correctly . . . ."

[*Id.* at 51]. Plaintiff also states that Defendants "owed Plaintiff a duty of care to be free from excessive force and to protect him from injury" under the Tennessee Governmental Tort Liability Act ("TGTLA") and asserts that Defendants' conduct "and other undiscovered negligent conduct" caused him "to suffer bodily injuries and severe pain and suffering" and he seeks compensatory damages for this claim [*Id.* at 52].

### 10. Claim Ten – Intention Infliction of Emotional Distress Against All Individual Defendants

Plaintiff next claims that all individual Defendants' actions "were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress" [*Id.* at 52]. Plaintiff again specifically references Defendant Officer Thornbury jerking Plaintiff out of his bunk, Defendants "unnecessarily and unreasonably" escalating "a simple body-cavity search into a situation involving a great violation of Plaintiff's right to privacy and a serious risk of bodily harm," in which Plaintiff was "repeatedly tased, punched in the head, maced or pepper-sprayed, [taken] down to the floor by as many as eight corrections officers, and kept in five point restraints in a chair for several hours" while wearing a mask "that hindered his ability to breathe freely" [*Id.* at 53]. He also cites his allegation that Defendant Lt. Miller refused to provide him with eye drops to help the burning in his eyes "until Plaintiff answered his questions to [Defendant] Lt. Miller's satisfaction" [*Id.*]. Plaintiff further states that Defendants' acts were "perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish on Plaintiff" [*Id.*].

24

### 11. Request for Relief

Plaintiff states that the acts alleged in his amended complaint "were done knowingly, intentionally, and maliciously, for the purpose of inflicting injury upon Plaintiff, and in reckless, wanton and callous disregard for his safety, security and civil rights" and that he seeks "compensatory damages of $1,000,000 as well as punitive damages of $2,500,000 (or in an amount to be proven at trial) sufficient to punish and deter the Individual Defendants and others in similarly situated positions from engaging in similar conduct in the future" [*Id.* at 53]. He also states that Defendant Knox County is liable "under Tenn. Code Ann. § 8-8-301" [*Id.*]. Plaintiff additionally requests "such damages as will fully compensate him for all injuries proximately caused by Defendants' actions" and that he may "have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs" and "post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper" [*Id.* at 54].

### C. Motion to Dismiss

As noted above, Defendants have filed motions to dismiss the complaint [Docs. 41, 42] in which they assert that claims in the complaint are subject to dismissal on various grounds, which the Court will address in turn.

#### 1. *Heck v. Humphrey*

First, Defendants claim that the Court must dismiss Plaintiff's claims because they arise out of the same incidents that led to Plaintiff's disciplinary convictions, relying on *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Balisok*, 520 U.S. 641 (1997) [Doc. 41 at 1–3; Doc. 42 at 2].

Specifically, in *Heck*, the Supreme Court determined that a prisoner cannot bring a claim for damages under § 1983 where his success in such a claim would "necessarily invalidate" his

conviction or sentence. *Heck*, 512 U.S. at 486. The Court extended this holding in *Balisok* by holding that a prisoner cannot bring a claim under § 1983 challenging prison procedures used to deny him "good time credits" where his success in such a claim would "necessarily imply the invalidity of the punishment imposed." *Balisok*, 520 U.S. at 648. The Supreme Court further expounded upon this doctrine in *Wilkinson v. Dotson*, in which it held that an inmate's "§ 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005); *see also Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (holding that an inmate alleging entitlement to speedier release must pursue such relief through habeas corpus action, rather than § 1983).

In his response in opposition to this argument, Plaintiff first argues that Defendants cannot rely on *Heck*/*Balisok* because the criminal charges against him arising out of the conduct underlying his relevant disciplinary convictions were dropped [Doc. 49 at 20–21]. Plaintiff next argues that, for *Heck*/*Balisok* to bar his § 1983 claims, his underlying disciplinary convictions must have affected the duration of the sentence imposed against him by a trial court, and Defendants have not shown that his disciplinary convictions will affect the duration of his original sentence [*Id.* at 21]. Lastly, Plaintiff argues that *Heck*/*Balisok* would not bar any claim for excessive force from Defendants arising out of acts before or after he stopped resisting officers [*Id.* at 21–22].

In reply, Defendants argue that the fact that Plaintiff's criminal charges were dropped has no effect on the application of *Heck*/*Balisok*, that a criminal sentence can never be extended by a disciplinary conviction and therefore the cases providing that *Heck* does not bar claims that do not increase a criminal sentence do not apply to disciplinary convictions that bar § 1983 claims, and

26

that Plaintiff has not specified what uses of force he alleges occurred before or after he stopped resisting officers, while noting that it appears Plaintiff's restraint chair claim would be the only such claim [Doc. 54 at 2].

In sur-reply, Plaintiff argues that his disciplinary convictions arose only from Defendant Thomas's allegation that Plaintiff bit him and Defendant Lt. Smith's allegation that Plaintiff kicked him, and that his claims arising out of other actions by Defendants after these acts therefore would not be barred by *Heck/Balisok* [Doc. 47 at 1–3].

Defendants have not established that *Heck/Balisok* bars any of Plaintiff's claims. Specifically, as to Claim One, set forth above, Defendants filed documents establishing that the disciplinary hearing officer recommended that Plaintiff lose behavior credits due to his disciplinary conviction for resisting an officer (arising out of the incident in which he alleges that Defendant Officer Thornbury "jerked" him out of bed), and that Captain Cox approved that recommendation [Doc. 38-1 at 24–29]. As to Claim Two (arising out of the altercation between Plaintiff and officers in the medical exam room), Defendant filed documents establishing that the disciplinary hearing officer recommended that Plaintiff lose behavior credits for his disciplinary conviction for assault on a staff member and that Captain Cox approved that recommendation [*Id.* at 1–23].

Thus, the record suggests that (1) Plaintiff lost behavior credits as a result of two separate disciplinary convictions underlying Claims One and Two of his amended complaint, and (2) the losses of these behavior credits may have extended the length of his confinement. Assuming those two things are true, *Heck/Balisok* would bar Plaintiff's claims for excessive force that arise of Defendants' uses of force that were "inextricably intertwined" with Plaintiff's acts that resulted in the disciplinary convictions that extended his confinement. *Wilkinson*, 544 U.S. at 81; *Cummings v. City of Akron*, 418 F.3d 676, 682–83 (6th Cir. 2005) (affirming lower court's finding that the

27

plaintiff's excessive force claims against a city and two officers were barred by *Heck* where the plaintiff had been convicted of a misdemeanor assault charge as to one of the officers because the same struggle gave rise to both the assault conviction and plaintiff's excessive force claims). However, Defendants have not alleged, much less set forth public records establishing, that Plaintiff's losses of these behavior credits will "invariably" lengthen his sentence. *Thomas v. Eby*, 481 F.3d 434, 439–40 (6th Cir. 2007) (holding that as Michigan's disciplinary credit system did not necessarily result in an earlier release, but rather only the possibility of an earlier release, the *Heck/Edwards* exception did not bar a prisoner's challenge under § 1983).

Accordingly, Defendants' requests for dismissal based on *Heck*/*Balisok* are **DENIED without prejudice**.

### 2. Failure to Exhaust

Defendants next argue that Plaintiff's claims are subject to dismissal due to his failure to exhaust his available administrative remedies for all claims except his claim against Defendant Lt. Smith for tasing him [Doc. 41 at 3–7; Doc. 42 at 2]. In support of this argument, they rely on Plaintiff's grievance as a public record [Doc. 41 at 3–7; Doc. 38-2]. In response, Plaintiff alleges that because jail officials addressed his grievance on the merits, they waived any argument that the grievance was procedurally inadequate, that he "made sufficient efforts to comply with the grievance process under the circumstances," and that the grievance process was so opaque that an ordinary prisoner could not navigate it [Doc. 49 at 23–24]. As support for his assertion that the grievance procedure was opaque, Plaintiff notes that the only grievance procedures available to him appear to be those listed on the grievance form that he filed, and that, while that form references an inmate handbook, there is no indication Plaintiff received such a handbook [*Id.*].

In reply, Defendant Knox County argues that (1) Plaintiff's assertion that the fact that jail officials reached the merits of his grievance forecloses any argument that it was improper does not apply to its argument that Plaintiff's grievance did not raise the substance of a number of his claims, and (2) Plaintiff's argument that the grievance procedure was unavailable is frivolous and inconsistent with his admission in his original pro se complaint that he did not explain all of the facts underlying his claims in his grievance because he did not realize "how illegal and unconstitutional the acts were" [Doc. 54 at 2–4].

In his sur-reply, Plaintiff argues that he attempted to comply with the grievance process by speaking with officers and filing his grievance, points out that his grievance implored the grievance chairperson to "watch the tape," and notes that Defendants have not established what level of specificity the applicable grievance procedure required him to provide [Doc. 74 at 3–4].

### a.    Standard

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  This requires "proper exhaustion" of administrative remedies.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  As such, prisoners must complete "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court."  *Id*. at 88.

To properly exhaust his claims, a prisoner must utilize every step of the prison's procedure for resolving grievance and follow the "'critical procedural rules'" in a manner that allows prisoner officials to review and, where necessary, correct the issues set forth in the grievance "'on the merits.'"  *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (quoting *Woodford*, 548 U.S. at

29

81, 95)). "There is no uniform federal exhaustion standard [and] [a] prisoner exhausts his remedies when he complies with the grievance procedures put forward by his correctional institution." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017).

Also, the Supreme Court has held that there are circumstances in which an administrative remedy may be "on the books" but "not capable of use to obtain relief." *Ross v. Blake*, 135 S.Ct. 1850, 1853–54 (2016). Specifically, an administrative procedure is unavailable where:

(1) in operation, the grievance process is a dead end because officers are "unable or consistently unwilling to provide any relief to aggrieved inmates";

(2) where the grievance process is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can navigate it"; and

(3) where administrators "thwart inmates from taking advantage of it though machination, misrepresentation, or intimidation."

*Id.* at 1853–54.

### b. Plaintiff's Grievance

Plaintiff's grievance states in relevant part as follows:

On 3-14-2019 I was jerked from my bunk and taken to medical for a "strip search." I entered the room with THREE other officers including Lt. Smith [and] was told to spread my cheeks and cough three times, Lt. Smith ordered the other two to cut on [their] "Body Cams" due to seeing something out of my backside, [h]e told me to reach behind me and remove the item and when I did not pull this item out of inside me I was immediately tased butt naked reaching behind me, I was tased THREE TIMES, sprayed in the face, spit mask on even though I did not spit at all and put in the restraint chair for TWO hours with the SPIT MASK smearing my tears [and] snot the whole two hours and [b]urnt severely my right side of face, then final[ly] I was able to get the drops that ease the burn from the nurse [and] placed in medical for a day or two . . . I strongly feel that this was excessive force, and definitely not supposed to be videotaped and showed around the police force here. I feel violated and over punished considering I showed ZERO AGGRESSION towards any officer, watch the tape!

[Doc. 38-2].

### c. Analysis[8]

First, while Plaintiff argues that the fact that jail officials addressed his grievance on the merits means that they waived any argument regarding procedural irregularities with the grievance,[9] Defendants do not attack procedural irregularities in Plaintiff's grievance. Rather, they attack the substance of the grievance by arguing that he did not include any facts regarding a number of his amended complaint claims in that grievance, and assert that he therefore failed to exhaust his available administrative remedies for those claims he did not include in his grievance.

Further, while Plaintiff alleges in his response to Defendant Knox County's motion to dismiss that the grievance system process was so opaque as to be unavailable, his only support for this assertion is that the grievance form did not have specific instructions and it is unclear whether he received the inmate handbook to which the grievance form states inmates can refer for additional grievance procedure information. Plaintiff is correct that his relevant grievance form does not include instructions for what he should include in the lined portion of the form that follows the words "Grievance statement (written by inmate)," and that this form states "[f]or additional information concerning the grievance procedure, please refer to the 'Inmate Handbook'" [Doc. 38-2 at 1]. Plaintiff also is correct that nothing in the record at this time establishes that he had access to the inmate handbook to which this form refers. However, the Court declines to find, based on

---

[8] Plaintiff does not dispute Defendants' assertion that his grievance is a public record or that Defendants' reliance on that grievance to support their motions converts them to a motion for summary judgment. Thus, the Court will consider this argument without converting the motions to dismiss to summary judgment motions. *Kassem v. Ocwen Loan Servicing, LLC*, 704 F. App'x 429, 432 (6th Cir. 2017) (providing that "courts may consider documents attached to a Rule 12(b)(6) [] motion without converting [it] into a summary-judgment motion if the attached materials are . . . 'matters of public record'").

[9] Where a jail addresses an otherwise procedurally inappropriate grievance on the merits, federal courts likewise generally consider any claim arising from that grievance on the merits. *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324–25 (6th Cir. 2010).

31

the record at this time, that this grievance form in which Plaintiff listed some, but not all, of his claims is sufficient to establish that the grievance process was so opaque as to be unavailable and therefore excuses him from the PLRA exhaustion requirement. *Ross*, 578 U.S. at 1859–60 (providing that a grievance process is opaque where "no ordinary prisoner can make sense of what it demands" and it is "essentially unknowable") (internal quotation marks omitted).

Also, the Court agrees with Defendants that Plaintiff's written grievance fails to refer to many of the key facts and claims in the amended complaint. Thus, if the applicable grievance procedures required Plaintiff to refer to all such facts and/or incidents in the written grievance, it does not appear that he gave Defendants an "opportunity to resolve [these claims] before being haled into court." *Jones v. Bock*, 549 U.S. 199, 219 (2007). But, as Plaintiff points out, his grievance form indicates that he first registered his complaints with a staff member and supervisor, his grievance implored the grievance chairperson to "watch the tape!," and Defendants have not established the level of detail the applicable jail grievance procedures required Plaintiff to include in his written grievance. *Jones*, 549 U.S. at 219 (explaining that "[c]ompliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust'").

Accordingly, without proof of what the applicable grievance policies required Plaintiff to include in his written grievance, the Court cannot discern which of Plaintiff's claims he failed to properly exhaust through available administrative remedies, and Defendants' requests to dismiss Plaintiff's claims on this ground will be **DENIED without prejudice**.

### 3. Physical Injury Requirement

Defendants next seek dismissal of Plaintiff's claims by asserting that he does not allege a more than *de minimis* physical injury [Doc. 41 at 7–11; Doc. 42 at 2]. In response, Plaintiff states that the main factor for evaluating an Eighth Amendment excessive force claim is the extent and

reason for the force, rather than the resulting injury, that his injuries (specifically a bump on his head, back injuries, burning eyes, nose, and face, hip and thigh injuries, and a wrist injury) are not *de minimis*, and that the Body Cam Footage does not "blatantly contradict[]" his claims that Defendants gratuitously tased and maced or pepper sprayed him [Doc. 49 at 25–27]. In reply, Defendant Knox County claims that Plaintiff mistakes the Eighth Amendment standard with the PLRA physical injury requirement, does not allege that Defendants caused his rectal bleeding,[10] and therefore does not allege a more than *de minimis* physical injury [Doc. 54 at 4–6]. In his sur-reply, Plaintiff again insists that his injuries are more than *de minimis* [Doc. 74 at 4].

Under the PLRA, "[n]o [f]ederal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a showing of physical injury or the commission of a sexual act[.]" 42 U.S.C. § 1997e(e). Under § 1997e(e), the physical injury need not be significant, but it must be more than *de minimis* for a request for compensatory damages based on an Eighth Amendment claim to stand. *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010). However, by its own language, § 1997e(e) is a "limitation on recovery," not a bar to asserting a claim. *See* 42 U.S.C. § 1997e(e). Accordingly, the Sixth Circuit has recently (1) held that "§ 1997e(e) allows prisoners alleging non-physical injury to still pursue claims for nominal damages, as well as injunctive and declaratory relief," (2) noted that its sister circuits also interpret this provision "to allow claims for punitive damages," and (3) recognized that this provision "'does not bar claims for constitutional injury that do not also involve physical injury.'" *Small v. Brock*, 963 F.3d 539, 543 (6th Cir. 2020) (citing *Aref v. Lynch*, 833 F.3d 242, 262–67 & n.15 (D.C. Cir. 2016) and quoting *King v. Zamiara*, 788 F.3d 207, 213 (6th Cir. 2015)).

---

[10] None of the factual allegations in the amended complaint allow the Court to plausibly infer that any Defendant caused Plaintiff's rectal bleeding, and thus the Court does not read the amended complaint to assert a claim for relief against any Defendant based on this allegation.

33

Thus, even if § 1997e(e) ultimately limits Plaintiff's ability to recover compensatory damages for some claims, the Court declines to reach this issue at this time, especially as Plaintiff does not seek compensatory damages for his violation of his privacy claims and seeks "any and all damages allowable" for his constitutional claims. As such, Defendants' motion to dismiss will be **DENIED without prejudice** to the extent that they seek dismissal on this ground.

### 4. Immunity

In its motion to dismiss, Defendant Knox County asserts that it is entitled to immunity under the TGTLA for Plaintiff's state law battery, negligence, intentional infliction of emotional distress, and intentional invasion of privacy claims [Doc. 41 at 11–16]. In response, Plaintiff agrees that this Defendant is entitled to immunity for his state law claims except the battery claim [Doc. 49 at 18–19]. In reply, Defendant Knox County concedes that if Plaintiff's battery claim otherwise survives its motion to dismiss, it states a claim for relief [Doc. 54 at. 6 n.1]. Accordingly, Defendant Knox County's motion to dismiss [Doc. 41] will be **GRANTED in part** to the extent that Plaintiff's state law claims against Defendant Knox County for negligence, intentional infliction of emotional distress, and intentional invasion of privacy will be **DISMISSED**.

### 5. Failure to State a Claim for Municipal Liability

Defendant Knox County next alleges that Plaintiff's complaint fails to allege a plausible claim against it for municipal liability[11] [Doc. 41 at 16–21[12]]. In response, Plaintiff appears to concede that he has not sufficiently pleaded facts that allow the Court to plausibly infer "that

---

[11] In its motion to dismiss, Defendant Knox County does not specifically address Plaintiff's sub-claim against it in Count Six regarding the use of the video footage for officer training, so the Court will not address this claim in this memorandum and order.

[12] Defendant Knox County also alleges that it is entitled to qualified immunity to the extent that the individual Defendants are entitled to this defense [*Id.* at 21–23]. However, the Court will address this below with the individual Defendants' argument for qualified immunity, if necessary.

34

officers engaged in a pattern of comparable constitutional violations" but argues that, for each of his municipal liability claims, he has sufficiently pled "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential" for a violation [Doc. 49 at 11–12 (quoting *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738 (6th Cir. 2015))]. Plaintiff then argues that he has set forth numerous acts of violence by officers in his complaint, that the incidents alleged in his complaint are likely to recur, and that it is obvious that an officer who does not receive sufficient training regarding use of force in such situations will violate the constitutional rights of another inmate [*Id.* at 13]. Plaintiff also argues that both his right to be free from gratuitous and excessive force and his right to be free of invasions of his privacy were clearly established [*Id.* at 13–18].

In reply, Defendant Knox County argues that (1) Plaintiff's right to privacy was not clearly established in this case, as he admits the strip/cavity search was justified; (2) Plaintiff's municipal liability claims fail without any facts suggesting that a policymaker was present or that similar prior incidents occurred; (3) Plaintiff has not provided facts about what training the officers received; (4) that, given the dangers of fentanyl, Plaintiff has failed to specify what training the constitution requires or how the officers' training departed from that standard; and (5) Plaintiff has failed to allege facts from which the Court can plausibly infer that Sheriff Spangler had notice that Defendants would violate Plaintiff's rights under the circumstances alleged [Doc. 54 at 6–8]. In sur-reply, Plaintiff states that he identified Sheriff Spangler as the policymaker, that he does not have to allege similar prior incidents to hold Defendant Knox County liable for failure to train under the second theory for proving municipal liability set forth in *Shadrick*, and that the actions of the officers in this case "were so egregious that the Court can infer that similar incidents have

35

not only occurred in the past, but will also recur" and therefore establish that Defendant Knox County failed to train the officers [Doc. 74 at 5].

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Moreover, "there can be no *Monell* liability under § 1983 unless there is an underlying unconstitutional act." *Thurmond v. Cty. of Wayne*, 447 F. App'x 643, 651 (6th Cir. 2011) (*quoting Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007)). However, a municipality may be liable for civil damages under § 1983 when the execution of its policy or its toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). A policy or custom may be established by demonstrating:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

An inadequate training policy "may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of a person with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Explaining this "deliberate indifference" necessary to support a claim of failure to train, the Supreme Court stated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnote omitted).

A plaintiff can establish that inadequate training is the product of deliberate indifference on the part of the municipality "in one of two ways." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738 (6th Cir. 2015). He can plead sufficient facts showing (1) the municipality's officers engaged in a pattern of comparable constitutional violations or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential" for a violation. *Id.* at 738–39 (quoting *Bryan Cnty.*, 520 U.S. at 409). An allegation of a pattern of similar misconduct—the first of the two approaches—is the "ordinar[y]" or traditional way for a plaintiff to establish an inadequate-training theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). This is so because repetitive wrongdoing by officers exercising their discretion indicates that the officers require additional training, and this should be "plainly obvious to the city policymakers." *Bryan Cty.*, 520 U.S. at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)). Thus, to succeed under this theory, plaintiffs generally must establish that "the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

But the Supreme Court has acknowledged "the possibility," "in a narrow range of circumstances," *Connick*, 563 U.S. at 63 (quoting *id.* at 409), that a municipal policymaker's deliberate indifference "could" arise without a pattern of prior constitutional misconduct, *Bryan Cty.*, 520 U.S. at 409. This is where the second of the two approaches comes into play. The Supreme Court confined this second approach to cases where there is a "likelihood that [a] situation will recur" with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409-10. For "liability to attach in the instance of a single violation, the record must show a complete failure to train the police force,

training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 567 (6th Cir. 2011) (internal quotation marks omitted).

Plaintiff has not pled any facts allowing the Court to plausibly infer that Defendant Knox County had knowledge of previous incidents similar to those in his complaint such that this municipality may be liable for his claims under the first theory for *Monell* liability. Thus, Defendants' motions to dismiss will be **GRANTED in part** to the extent that Plaintiff's *Monell* claims against Defendant Knox County arising out of this first theory will be **DISMISSED**. Further, while Plaintiff repeatedly alleges in his complaint that Defendant Knox County ratified and/or condoned the acts alleged in his amended complaint to support his *Monell* claims, he appears to abandon those claims, which are not cognizable under the applicable law as set forth above, in his response in opposition to Defendant Knox County's motion to dismiss by asserting that even if his claims fail to adequately allege municipal liability under the first theory, they may proceed under the second [Doc. 49 at 12]. Accordingly, these claims will also be **DISMISSED**.

However, Plaintiff has adequately alleged that cavity searches similar to the one at issue in his complaint is likely to recur, and that Defendant Knox County failed to train its officers for such an event with regard to both use of force and privacy concerns. Accordingly, Plaintiff's *Monell* liability claims against Defendant Knox County will proceed only under this theory.

### 6. GTLA Immunity

The individual Defendants argue that, to the extent that the Court denies Defendant Knox County immunity from Plaintiff's negligence, intentional infliction of emotional distress, and intentional invasion of privacy, they are entitled to statutory immunity for these claims [Doc. 42 at 3–4]. They also allege that, if the Court grants Defendant Knox County's motion to dismiss

38

Plaintiff's *Monell* claims against it arising out of municipal liability, they are entitled to immunity from Plaintiff's negligence claims, in support of which they cite and rely upon an order from this Court in a separate case, specifically *Devereux v. Knox County, et al.*, No. 3:17-CV-197-JRG-HBG [filed in this case record as Doc. 38-5], which is currently on appeal to the Sixth Circuit and which they assert created a "split of authority" on this issue.

Unless the TGTLA specifies otherwise, it provides blanket immunity for all governmental entities in suits for injuries resulting from the exercise of governmental duties. *Johnson v. City of Memphis*, 617 F.3d 864, 871–2 (6th Cir. 2010); Tenn. Code Ann. § 29-20-201(a). However, the TGTLA removes governmental immunity where a governmental employee, acting within the scope of his employment, causes an injury to a plaintiff through a negligent act or omission. In such cases, governmental immunity is removed, and the TGLTA shields the employee with immunity. Tenn. Code Ann. §§ 29-20-205 & 29-20-310(b). But there is also an exception (to this exception) for claims for "infliction of mental anguish, invasion of right of privacy, or civil rights," which means that, for such claims, the individual employee may be held liable, while the government retains its immunity. *Id.* § 29-20-205(2); *Johnson*, 671 F.3d at 871–72 (finding civil rights exception applied when plaintiff's claim for negligence arose out of the same circumstances giving rise to her civil rights claim under § 1983).

In the *Devereux* order on which the individual Defendants rely, the Court found that the plaintiff's claims that Knox County was liable for violations of his civil rights under *Monell* failed to state a claim upon which relief may be granted under § 1983, and therefore dismissed them [Doc. 38-5 at 5–9]. However, the Court then declined to dismiss the plaintiff's negligence claims against Knox County, noting that Knox County had not argued that those claims were inadequate under state law and that, as the Court had dismissed the plaintiff's civil rights claims against Knox

39

County, the plaintiff had no pending civil rights claims from which his negligence claim could "directly flow" [*Id.* at 9–12]. As such, the Court found that the plaintiff's negligence claim against Knox County in the *Devereux* case did not fall within the "civil rights" exception to the TGTLA's removal of Knox County's immunity and therefore allowed that claim to proceed [*Id.* at 12].

The individual Defendants rely on *Devereux* to assert that they are entitled to immunity from Plaintiff's negligence claim if the Court grants Defendant Knox County's motion to dismiss Plaintiff's civil rights claims for failure to state a claim, seemingly arguing that, under the reasoning of *Devereux* and the TGTLA, if the Court grants Defendant Knox County's motion to dismiss Plaintiff's civil rights claims against it, his negligence claim would still proceed against Defendant Knox County. However, the reasoning of this Court in the *Devereux* order does not apply here, as Plaintiff's *Monell* claims against Defendant Knox County state a claim upon which relief may be granted under § 1983, and Plaintiff and Defendant Knox County agree that Defendant Knox County is entitled to immunity for his state law claims except the battery claim [Doc. 49 at 18–19]. In other words, as all parties appear to agree, and the record supports finding, that Plaintiff's negligence claims "directly flow" from the same acts underlying his civil rights claims against all Defendants, all of which are still pending, the reasoning of *Devereux* does not apply here. As such, this argument is moot, and the Court will not further address it.

### 7. Time Bar for Claims Against Defendants Smith and Bakker

Defendants Smith and Bakker next argue that Plaintiff's claims against them are time-barred because his original pro se complaint named them as "Lt. Jim Smith" and Officer "Bakker" while his amended complaint, which counsel for Plaintiff filed on November 3, 2020, names them as "Lt. Josh Smith" and "Adam Bakker" [Doc. 30], and these Defendants assert that this name change does not relate back to Plaintiff's original complaint because they did not have notice of

40

Plaintiff's claims against them within the ninety-day time period for service of process under Rule 4(m) of the Federal Rules of Civil Procedure [Doc. 42 at 4–6].[13]  This argument is without merit.

### a.    Background

On January 23, 2020, Plaintiff signed his initial pro se complaint, in which he named "Lt. Jim Smith" and "Officer Bakker" as Defendants [Doc. 1], as well as his motion for leave to proceed *in forma pauperis* [Doc. 2].  On February 25, 2020, the Court entered an order granting Plaintiff leave to proceed *in forma pauperis* [Doc. 5].  Then, on June 22, 2020, the Court entered an order screening the initial complaint and requiring Plaintiff to return service packets for the remaining Defendants [Doc. 6].  Plaintiff addressed the summons he returned for the Defendant he named as "Officer Bakker" to "Officer Bakker" [Doc. 10 at 4–5], addressed the summons returned for the Defendant he named as "Lt. Jim Smith" to "Lt. J. Smith" [*Id.* at 13], and included a description of when these Defendants worked on their summonses [*Id.* at 4, 13].  The summons returned for "Lt. J. Smith" indicates that it was returned unexecuted on July 28, 2020, due to multiple officers having that name [Doc. 22 at 1].[14]  The summons for "Adam Bakker" was returned as executed on July 31, 2020, but an individual other than "Adam Bakker" signed for it [Doc. 24 at 1, 4].

---

[13] Defendants do not allege that this renaming of parties amounted to an addition of parties, which would not relate back under Rule 15(c), *see Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (finding "Sixth Circuit precedent clearly holds that new parties may not be added after the statute of limitations has run, and that such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)[]"), but rather only that their lack of notice of the lawsuit within ninety days of the original complaint entitles them to dismissal of Plaintiff's claims against them.

[14] Counsel for Plaintiff initially filed waivers of service on behalf of all Defendants [Docs. 11, 12, 13, 14, 15, 16, 17].  However, counsel for Knox County filed a motion to withdraw those waivers as to the individual Defendants because Plaintiff's counsel had filed them in error, which Plaintiff did not oppose, and the Court granted that motion [Docs. 25, 26].

Then, on November 3, 2020, Plaintiff, through counsel, filed an amended complaint naming these Defendants as "Lt. Josh Smith" and "Adam Bakker" [Doc. 30]. New summonses issued, and all Defendants filed waivers of service [Docs. 31, 32, 33, 34, 35, 26].

### b. Applicable Law

Rule 15(c) of the Federal Rule of Civil Procedure provides as follows:

(1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

    (A) the law that provides the applicable statute of limitations allows relation back;

    (B) the amendment asserts a claim or defense that arose out of the same conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

    (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

        (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
        (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

Under Rule 4(m) of the Federal Rules of Civil Procedure, a defendant must be served with process within ninety days after a complaint is filed. Fed. R. Civ. P. 4(m). If a plaintiff misses this deadline, "the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.* However, upon a showing of good cause by the plaintiff, "the court must extend the deadline for service for an appropriate period." *Id.*

Accordingly, for an amendment that changes a party to properly relate back, the party must have received notice of the action within ninety days after the initial complaint is filed. *See*

42

*Lockhart v. Holiday Inn Express Southwind*, 531 F. App'x 544, 548 (6th Cir. 2013).[15] Constructive

notice may satisfy this requirement. *See Berndt v. Tennessee*, 796 F.2d 879, 884 (6th Cir. 1986)

(providing that "[w]e believe that Rule 15(c) does not require that the new defendants received

actual notice…. It is enough that the new defendants received constructive notice of the suit").

But lack of timely notice may be excused for good cause, pursuant to Rule 4(m). *Jackson v.

Herrington*, 393 F. App'x 348, 353–54 (6th Cir. 2010).

Further, with regard to service of process by litigants proceeding *in forma pauperis*, the

Sixth Circuit has stated as follows:

> Together, Rule 4(c)[3] and 28 U.S.C. § 1915[d] stand for the
> proposition that when a plaintiff is proceeding in forma pauperis the
> court is obligated to issue plaintiff's process to a United States
> Marshal who must in turn effectuate service upon the defendants,
> thereby relieving a plaintiff of the burden to serve process once
> reasonable steps have been taken to identify for the court the
> defendants named in the complaint.

*Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996).

### c. Analysis

First, while Defendants Lt. Smith and Officer Bakker seek dismissal of Plaintiff's claims

against them by claiming they did not have knowledge of Plaintiff's lawsuit within ninety days of

his original complaint, they have filed no proof to establish this, despite relying on case law clearly

indicating that this is main focus for such an inquiry [Doc. 42 at 6 (citing *Krupski v. Costa Crociere

S. p. A.,* 560 U.S. 538, 541, 130 S. Ct. 2485, 2489 (2010))]. Rather, instead of leaving this issue

for summary judgment and filing proof to establish it, Defendants Lt. Smith and Officer Bakker

---

[15] *Lockhart* lists the Rule 4(m) time for serving a defendant as 120 days, however, an amendment later reduced that time to 90 days. Fed. R. Civ. P. 4(m) advisory committee's note to 2015 amendment (providing that "[s]hortening the time to serve under Rule 4(m) means that the time of the notice required by Rule 15(c)(1)(C) for relation back is also shortened").

43

generally assert in their motion to dismiss that they "clearly" did not have notice of and "could not have possibly known" about this lawsuit within ninety days of Plaintiff's original complaint [*Id.*].

But even if the Court assumes that Defendants Lt. Smith and Bakker did not have knowledge of Plaintiff's claims within ninety days of his original complaint, their allegation that this is fatal to Plaintiff's claims against them is misplaced. Specifically, the individual Defendants note that, in *Krupski*, the Supreme Court held that "the inquiry for relation back under Rule 15(c) is mandatory, rather than discretionary - in contrast to the inquiry under Rule 15(a)," and then argue that, as they did not have knowledge of Plaintiff's claims within ninety days of his original complaint, the Court must dismiss his claims against them [*Id.* (citing *Krupski*, 560 U.S. at 553)].

However, *Krupski* does not support Defendants' implied assertion that Rule 15(c) mandates dismissal of claims where a Defendant did not receive notice of a complaint within the Rule 4(m) time period. Instead, *Krupski* provides that Rule 15(c) "mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation back to the district court's equitable discretion." *Krupski,* 560 U.S. at 553. Thus, *Krupski* does not remove the Court's ability to find good cause to extend the time for Rule 4(m) notice, but rather only points out that Rule 15(c) requires a court to find that a complaint amendment relates back if the amendment satisfies the Rule's requirements. *Id.*

This conclusion is bolstered by the fact that, two months after the Supreme Court decided *Krupski*, the Sixth Circuit specifically held that Rule 15(c)'s incorporation of Rule 4(m)'s time baseline also incorporated "Rule 4(m)'s good cause baseline exception." *Jackson*, 393 F. App'x 348, 353–54 (6th Cir. 2010) (finding that a pro se plaintiff was entitled to Rule 4(m)'s good cause exception and relation back of his claims in his amended complaint under Rule 15(c)(3) where he filed his original complaint against the defendants in their official capacities in December 2005,

the district court initially dismissed the complaint for failure to state a claim before reinstating some claims on December 21, 2006, and the plaintiff filed an amended complaint against the defendants in their individual capacities on January 6, 2007, because the failure to issue summons earlier was due to the district court's need to screen the complaint before summons may issue).

Like the Plaintiff in *Jackson*, Plaintiff is entitled to the good cause exception to extend his time to amend his complaint to properly name Defendants Lt. Smith and Bakker, as it is apparent that Plaintiff took reasonable steps to identify these Defendants to the Court in his original complaint, and the Court's delay in screening the complaint led to the delay in the issuance of summonses upon which Defendants rely to assert that they did not have any reason to have notice of Plaintiff's claims. Accordingly, the Court finds that Defendants' argument that Plaintiff's claims in his amended complaint against Defendants Lt. Smith and Officer Bakker are time-barred is not well-taken and their request for relief on this ground is **DENIED**.

### 8. Qualified Immunity

In their motion to dismiss, the individual Defendants also seek dismissal of Plaintiff's complaint based on qualified immunity. The doctrine of qualified immunity "shields governmental officials from monetary damages as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017) (internal quotation marks omitted). In ruling on a motion to dismiss under Rule 12(b)(6) based on qualified immunity, the Court applies the Sixth Circuit's "two-tiered inquiry." *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015) (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)) (internal quotation marks omitted).

45

In the first step, the Court must determine if the facts plausibly assert a violation of a constitutional right. *Id.* At the second step, the Court must determine if the right at issue has been clearly established, "such that a reasonable [government actor] would have known his conduct violated it." *Id.* (quoting *Martin*, 712 F.3d at 957) (internal quotation marks omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates the right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (internal quotation marks omitted). While generally a court should look to binding precedent with sufficiently similar facts to the case in front of it, "[s]ome violations of constitutional rights are so obvious that a 'materially similar case' is not required for the right to be clearly established." *Hearring v. Sliwowski*, 712 F.3d 275, 279–280 (6th Cir. 2013) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Taylor v. Riojas*, 208 L. Ed. 2d 164, 164–65 (2020) (per curiam) (holding that, in an outrageous case, a "general constitutional rule" will serve as sufficient notice to an officer claiming qualified immunity) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Once a defendant pleads the qualified immunity defense, the plaintiff bears the burden of rebutting the defense by showing "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *Ashcroft*, 563 U.S. at 741). While the plaintiff bears this burden, it "is a low bar." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020).

Also, with regard to qualified immunity, a court must determine "each defendant's liability . . . individually based on his own actions." *Hart v. Hillsdale Cty*, 973 F.3d 627, 635 (6th Cir. 2020) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). "The test is whether,

reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562–63 (6th Cir. 2011).

The Sixth Circuit has indicated that a court should determine whether qualified immunity shields an officer from liability as early as possible. *Hart*, 973 F.3d at 635. But it also warns that this determination is often better left for summary judgment, as it may be "perilous" to determine whether the qualified immunity defense applies prior to development of the factual record. *Id*.

### a. Defendants' Argument

The individual Defendants first note that public records filed in support of their motion for summary judgment show that Plaintiff admitted in the criminal proceedings against him that arose out of the March 14, 2019 incidents in the jail that the bag of drugs he had in the penal facility contained fentanyl [Doc. 42 at 10; Doc. 38-3 at 4, 6]. The individual Defendants then argue that the video blatantly contradicts Plaintiff's allegation in his amended complaint that, soon after he entered the medical exam unit room, Defendant Lt. Smith "hit[] him hard in the upper back, knocking [Plaintiff] into the table to his front" and assert that the video actually shows "nothing more than a shove" from this Defendant to keep Plaintiff facing forward [Doc. 42 at 11].

The individual Defendants next note that the video establishes that Plaintiff lied about having a bag of drugs in his rectum and allege that, after he was told to face forward and that he was "very close to being tased," he looked to his left [*Id.* at 11–12]. The individual defendants also point out that, while Plaintiff acknowledges that Defendant Lt. Smith's statement about the tasing incident indicates that Plaintiff actually shoved the drugs further into his rectum before he was initially tased, Plaintiff does not deny in his amended complaint that this is what occurred [*Id.* at 12–13]. The individual Defendants therefore argue that, if Plaintiff was tased to keep him from

47

shoving the bag of drugs further inside of him, "the [t]aser may have saved his life," and that Plaintiff's allegations in his amended complaint fail to allow a plausible inference that the initial use of the taser was unjustified [*Id.* at 13–14].

The individual Defendants next state that Plaintiff alleges in his amended complaint that, after the initial use of the taser, he tried to swat away the taser probes "by reflex" and "reflexively tried to defend himself from further injury and abuse" but assert that they had no way to know that these acts were reflexive and only knew that "they were now dealing with an inmate who was smuggling highly dangerous drugs in his rectum, repeatedly lying to the officers in an effort to keep the drugs, repeatedly disobeying their commands and warnings, and now resisting their use of force" [*Id.* at 14].

Defendants also claim that, at 1:36 on the video, Plaintiff "clearly resisted commands to get on the ground" before an officer drive stunned him and that, at 1:39, the video shows Plaintiff remove the drugs from his rectum [*Id.* at 14]. Defendants additionally state that the video establishes that they had not recovered the drugs prior to the drive stun, as you can hear an officer say "there it is, there it is" at 1:47–48 on the video [*Id.* at 15]. Defendants further assert that, at 1:56-58, the video shows Defendant Officer Thomas has a ripped glove and red marks in the area of the tear and that Defendant "Officer Thomas reacted involuntarily in pain" after Plaintiff bit him [*Id.* at 15–16]. They then point out that Plaintiff does not deny biting Defendant Officer Thomas in his amended complaint [*Id.* at 16].

The individual Defendants further summarize the events in the medical unit room after Plaintiff's altercation with officers and before Plaintiff was taken to the restraint chair [*Id.* at 16]. They next assert that the video blatantly contradicts Plaintiff's allegation that he was left in the restraint chair without treatment for the burning of the chemical agent, as the video shows a nurse

checking Plaintiff's restraints and providing him eye wash [*Id.* at 16–17]. The individual Defendants then note that Plaintiff did not sue the nurse and they are not liable for any deficient medical care she may have provided him [*Id.* at 17].

The individual Defendants then argue that they had to assume that Plaintiff had fentanyl, which is well-recognized as an extremely dangerous substance, in the baggie of drugs in his rectum, and that this justifies their uses of force, as they are "entitled to assume that fentanyl may be found and to treat suspected fentanyl as a deadly weapon" [*Id.* at 17–18]. The individual Defendants assert that the Court must give their decisions regarding use of force under the circumstances a high level of deference, as "the events in question were very tense, uncertain, and rapidly evolving," and that this justifies their uses of force [*Id.* at 18]. The individual Defendants also assert that, in the alternative, Plaintiff cannot show that he had a clearly established right to be free from the relevant uses of force because he "cannot point to a case clearly establishing that use by corrections officers of a taser and chemical agent was excessive or unreasonable to gain compliance when officers reasonably believe an inmate had possession of highly dangerous drugs which he could attempt to ingest or use as weapons against them, the inmate had repeatedly and falsely denied he had drugs in his rectum, resisted commands and warnings, assaulted an officer and was unrestrained" [*Id.* at 18]. The individual Defendants then point out that, for qualified immunity purposes, they must each be judged only on their own actions and recite some of Plaintiff's factual allegations against each of them [*Id.*].

As to Plaintiff's invasion of privacy claim, the individual Defendants assert that Plaintiff "cannot show it is clearly established that the door of an exam room in a medical unit of a jail must remain closed during a body cavity search when the inmate becomes or even may become unruly and violent; or that allowing a female nurse to attend to him and remove the Taser probes from his

49

back violated clearly established rights," and that Plaintiff does not allege that any of them used the video footage of his strip/cavity search for training [*Id.* at 18–19].

Lastly, the individual Defendants argue that, to the extent they are entitled to qualified immunity under federal law, they are also entitled to the same such qualified immunity under state law [*Id.* at 19–20].

### b. Plaintiff's Response

Plaintiff first disputes the individual Defendants' characterization of the video footage as blatantly contradicting his assertion that Defendant Lt. Smith hit him hard in the back in the medical unit room and notes that the relevant consideration is whether the force was in good faith and for the purposes of maintaining and restoring discipline [Doc. 48 at 19–20]. Plaintiff does not dispute that Defendant Lt. Smith pushed him in the back to keep him from facing this Defendant after he had disobeyed an instruction to face forward but notes that this Defendant does not contend that he felt intimidated or threatened by Plaintiff or that Plaintiff was acting aggressively [*Id.*].

Plaintiff then claims that the individual Defendants' allegation that they believed that "they were now dealing with an inmate who was smuggling highly dangerous drugs in his rectum, repeatedly lying to the officers in an effort to keep the drugs, repeatedly disobeying their commands and warnings, and now resisting their use of force" does not overcome his "right to be free from the unnecessary and wanton infliction of pain" [*Id.* at 20].

Plaintiff next argues that his response to the individual Defendants' motion to dismiss, the video footage, and his amended complaint establish that Defendant Lt. Smith's did not initially tase him "in a good faith effort to maintain or restore discipline," but rather, "maliciously and sadistically for the very purpose of causing harm." [*Id.* (citations omitted)]. He also points out that his failure to deny in his amended complaint that he pushed the drugs further into his rectum is not

relevant to the Court's determination of whether his allegations plausibly state a claim for relief, and that the Court must construe his allegations in the light most favorable to him [*Id.* at 20–21].

Plaintiff additionally claims that the individual Defendants allege that the fact they suspected that he was concealing dangerous drugs "gave them license to hit him, knee him, punch him, repeatedly tase him, taken him down, spray his eyes with chemicals, hog-tie him, and strap him to a chair for hours" and that their assertion that Defendant Lt. Smith's act of tasing him "may have saved [Plaintiff's] life has no factual basis whatsoever" [*Id.* at 21]. Plaintiff then asserts that the individual Defendants, as "presumably experienced officers" should have had knowledge of the known effects of tasing and that their assertion that they could not have known that his acts after the taser firing were "reflexive" indicates that their "training was worse than initially suspected" [*Id.* at 21]. In support of this assertion, Plaintiff cites an article from "Business Insider" stating that a taser results in "a power surge to your nerves. The shock overwhelms your nervous system, causing your muscles to lock up. As a result, you can't move and will likely fall down . . . .Your brain's ability to process new information is also impaired" [*Id.* n.12]. Plaintiff then cites case law providing that use of a taser causes pain, temporary paralysis, immobilization, disorientation, loss of balance, and weakness, and therefore claims that the individual Defendants' argument that his "involuntary response to being tased was an act of resisting" is "absurd[]" and "needs no further debate[]" [*Id.* at 22 (citations and quotations omitted)].

Plaintiff further notes that while Defendants claim that they "were dealing with a life-threatening emergency," the amended complaint does not make any such assertion [*Id.*]. He also notes that the allegation that he bit Defendant Officer Thomas is not in his amended complaint, that the video does not support this allegation or show him doing so, and that, while the video shows this Defendant holding up a glove with a red/pink substance that may be blood, this occurred

51

after this Defendant had punched him in the head [*Id.* at 22–23].  Plaintiff further alleges that the video shows him completely immobilized and surrounded by officers when officers administer the drive-stun and chemical agent [*Id.* at 23].  Plaintiff then points out that while Defendants assert that a nurse washed his eyes after he was in the restraint chair, his amended complaint alleges that he was left in the chair for hours with chemicals burning his eyes, mouth, and nose [*Id.*].

Plaintiff also argues that "[i]t is clearly established that the use of force on a non-resistant or passively-resistant individual – like [Plaintiff] – may constitute excessive force" and that Defendants "Lt. Smith and Officer Bakker would reasonably have been apprised that the use of a Taser on an inmate who was not threatening officers would violate a constitutional right" [*Id.* at 24 (citing *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (6th Cir. April 8, 2010)).  He further asserts that the act of strapping him in the restraint chair "was unnecessary, wanton, or [] sadistic retaliation" and that Defendants Lt. Smith and Officers Miller and Bakker were reasonably apprised that doing so would violate his constitutional rights[16] [*Id.* at 24–25 (citing *Miller v. Rubenstein*, No. 2:16-CV-05637, 2018 WL 736044, at *15-16 (S.D. W.Va. Feb. 6, 2018)].

As to his violation of privacy claim, Plaintiff points out that the Sixth Circuit has held that "[a] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual," *see Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572–73 (6th Cir. 2013), and therefore argues that Defendants were reasonably apprised that exposing his naked body to officers and inmates would violate his right to privacy [*Id.* at 25].  In the alternative, Plaintiff asserts that the Court should find that his right not to be forcibly stripped

---

[16] However, Plaintiff did not bring a claim for retaliation in his amended complaint, and, as set forth above, he brought his claim arising out of his time in the restraint chair against only Defendant Miller.

and exposed to inmates and officers was "sufficiently obvious under the general standards of constitutional care" [*Id.* at 25–26].

Plaintiff also disagrees that Defendants are entitled to qualified immunity for his state law claims [*Id.* at 26–27].

### c.     Individual Defendants' Reply

In their reply, the individual Defendants emphasize (1) that the Sixth Circuit has found reversible error in a denial of a motion to dismiss based on qualified immunity, (2) that the fentanyl justified their uses of force, and (3) that the Body Cam Footage and other language in his response belie Plaintiff's allegation that he "did his best to comply" with officers [Doc. 55 at 3–6]. The individual Defendants also argue that Plaintiff's statement that he told officers that he had a prescription for the contraband is irrelevant, as the record establishes that the baggie contained fentanyl [*Id.* at 6–7]. The individual Defendants further assert that the record establishes that Plaintiff lied to them and that the Body Cam Footage establishes that officers reasonably commanded and warned him before reasonably using force [*Id.* at 7–8]. The individual Defendants also again note that Plaintiff's amended complaint does not deny that Defendant Lt. Smith initially tased Plaintiff after he shoved the drugs further into his rectum [*Id.* at 8].

The individual Defendants further state that Plaintiff does not acknowledge the holding in *Wilkins v. Gadd*y, 559 U.S. 34, 37 (2010) that "[a]n inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim" (internal quotations admitted), does not analyze each individualized Defendant's acts separately, and "unfairly categorizes" himself as a "non-resistant or passively-resistant individual" [*Id.* at 8–10]. The individual Defendants then assert that a reasonable officer would have believed that Plaintiff was actively resisting them while he was in possession of fentanyl, a deadly substance, and that

Plaintiff has "failed to point to any case clearly establishing that the use by corrections officers of a taser or chemical agent is excessive or unreasonable when officers reasonably could believe an unrestrained inmate has possession of highly dangerous drugs, falsely and repeatedly denies he had drugs in his rectum, resists commands and warnings, and assaults an officer" [*Id.* at 10–11].

As to the invasion of privacy claim, the individual Defendants claim that only one female was present during the search, and that Plaintiff has not shown that opening a jail exam room door "during a body cavity search when the inmate becomes or even may become unruly and violent" violated his clearly established rights "or that allowing a female nurse to attend to him and remove the Taser probes from his back violate[d] clearly established rights" [*Id.* at 11–12].

### d. Plaintiff's Sur-Reply

In his sur-reply, Plaintiff states that too many "fact intensive" inquiries remain about his claims for the Court to grant the individual Defendants qualified immunity and claims that the individual Defendants:

> appear to suggest that any inmate who lies to officers has given license to officers to be repeatedly tased, repeatedly punched about the head and face, pepper sprayed in the face, hog-tied, held face-down on the floor and smothered, etc. They further suggest that forcibly stripping an inmate completely naked, exposing him to as many as eight or more officers and/or nurses and others is likewise constitutionally appropriate.

[*Id.* at 3]. Plaintiff also avers that he has adequately alleged violations of his clearly established rights [*Id.* at 3–4].

### e. Legal Standards

#### i. Excessive Force

The parties agree that Plaintiff's claims for excessive force implicate the Eighth Amendment's prohibition against cruel and unusual punishment. *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002). In determining whether a prison official has violated the Eighth

54

Amendment, courts apply a two-part inquiry that is made up of subjective and objective components: (1) "whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm," i.e. the subjective component; and (2) whether the conduct, in context, is sufficient serious to offend "contemporary standards of decency," i.e., the objective component. *Hudson v. McMillan*, 503 U.S. 1, 6, 9 (1992).

The subjective prong requires consideration of the need for the use of force, the relationship between that need and the force used, the threat the official reasonably perceived, and the extent of the injury. *Hudson*, 503 U.S. at 7. To satisfy the objective component, an inmate need not prove a serious injury, but the extent of the injury may be probative of whether the force was plausibly "thought necessary" in the situation. *Wilkins*, 559 U.S. at 37. However, "not every malevolent touch by a prison guard" creates a federal claim, and *de minimis* uses of physical force that are not repugnant to the conscience of mankind do not violate the Eighth Amendment. *Id.* (quoting *Hudson*, 503 U.S. at 9 and holding that "[a]n inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim" (internal quotations admitted)). In fact, the good faith use of physical force in pursuit of a valid penological objective will rarely, if ever, violate the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

### ii. Invasion of Privacy

The Fourth Amendment prohibits only "'unreasonable'" searches and seizures. *Williams v. City of Cleveland*, 907 F.3d 924, 935–36 (6th Cir. 2018) (quoting *Bell v. Wolfish*, 441 U.S. 520, 558 (1979)). The determination of the reasonableness of a prison search requires a court to balance the need for the search against the resulting invasion of privacy. *Id.* (citing *Bell*, 441, U.S. at 559). In doing so, "'[courts] must consider the scope of the particular intrusion, the justification for

initiating it, and the place in which it is conducted.'" *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir 2014) (quoting *Bell*, 441, U.S. at 559). The court must also examine whether any "obvious, easy alternatives" existed to better accommodate the prisoner's privacy interest "at little cost to valid penological objectives." *Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 530–31 (6th Cir. 2016).

The Sixth Circuit has recognized that "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy" and that, even where an officer has valid reasons for a search, it may violate the prisoner's privacy rights if the officer conducts it where others can view the prisoner naked unless "special circumstances provide additional justifications." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 573, 574 (6th Cir. 2013). Thus, where jail officials perform a strip search in view of others "'who do not share the searching officers' institutional need to view [him] unclothed,'" the relevant question is whether valid penological objectives justified the invasion of the prisoner's privacy. *Williams*, 907 F.3d at 936 (quoting *Williams*, 771 F.3d at 953) (citations omitted); *Stoudemire*, 705 F.3d at 573–74 (providing that, where a strip search occurred "in view of other inmates and prisoner personnel," the relevant question was "whether any exigent circumstances compelled" the defendant to strip search the plaintiff in view of others).

### f. Analysis

The Court will analyze each Defendant separately with regard to qualified immunity.

### i. Defendant Lt. Smith

Plaintiff's claims for relief against Defendant Lt. Smith are based on his allegations that this Defendant:

(1)    Violated Plaintiff's Eighth and Fourteenth Amendment rights when he initially tased Plaintiff in the medical unit exam room because he "decided to escalate the situation into a physical confrontation" after Plaintiff "started to" comply with this Defendant's order for him to remove the drugs from his rectum and "was doing

56

exactly as Lt. Smith commanded, i.e., reaching his left hand behind him to remove something from his buttocks" [Doc. 30 at 17–18; 29[17]];

(2)      Violated Plaintiff's right to privacy under the Fourth and Fourteenth Amendments by forcibly stripping him completely naked to perform a strip/cavity search in a room with a door that periodically opened onto "a long, busy hallway where countless people were wandering by and looking on" and therefore forced "Plaintiff to expose his naked body to innumerable strangers, men and wom[e]n alike" [*Id.* at 34];

(4)      Violated Tennessee law by committing a battery against Plaintiff by tasing him [*Id.* at 49];

(5)      Violated Tennessee law by invading Plaintiff's reasonable expectation of privacy when he stripped Plaintiff naked in a room where officers periodically opened the door in a manner that exposed "Plaintiff's genitals to officers, medical staff, inmates, and others" [*Id.* at 49–50];

(6)      Tased and used a chemical agent on Plaintiff in a manner that amounted to negligence under Tennessee law [*Id.* at 50–52]; and

(7)      Tased and used a chemical agent on Plaintiff in a manner that intentionally inflicted mental anguish on Plaintiff in violation of Tennessee law [*Id.* at 52–53].

As to Plaintiff's first claim against this Defendant arising out of his initial tasing, he alleges

in his "Factual Allegations" only that he "started to do as Lt. Smith commanded, reaching toward

---

[17] As set forth above, in their motion to dismiss, the individual Defendants assert that Plaintiff's factual allegation that Defendant Lt. Smith "hit[] him hard in the back" soon after he entered the medical unit room is blatantly contradicted by the video footage, which Defendants assert shows only a "shove." However, while Plaintiff listed Defendant Lt. Smith's act of hitting him in the back in his "Factual Allegations," he did not refer to it in the section of the complaint in which he sets forth his claim for relief for violation of his Eighth and Fourteenth Amendment rights against all individual Defendants arising out of the events in the medical exam unit room [Doc. 30 at 28 –32]. Thus, for the reasons set forth above, the Court does not read the complaint to assert a claim for relief arising out of this act. Even if Plaintiff intended to state such a claim, however, he failed to do so, as Plaintiff does not allege facts in his complaint that allow the Court to plausibly infer that this "hit" was without penological justification. Rather, he only alleges that he had "offered, at most, passive resistance to the commands" prior to this "hit" and does not allege any injury resulted from it. *Wilkins v. Gadd*y, 559 U.S. 34, 37 (2010); *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986); *see also Scheid v. Fanny Farmer Candy*, 859 F.2d 434, 437 (6th Cir. 1988) (noting that "when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist") (quoting *OBrien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976)).

his buttocks, still making no effort to resist" and that Defendant Lt. Smith then tased him [Doc. 30 at 17–18]. But he later specifies in his "Claims for Relief" that this Defendant tased him after deciding "to escalate the situation into a physical confrontation . . . just as Plaintiff was doing exactly as [this Defendant] had commanded," specifically reaching behind himself to remove the bag from his rectum[18] [Id. at 29]. As this latter allegation allows the Court to plausibly infer that Defendant Lt. Smith's initial act of tasing him violated a clearly established right and the video footage does not "blatantly contradict" it, this claim will proceed. Kijowski v. City of Niles, 372 F. App'x 595, 600 (6th Cir. April 8, 2010); see also McCoy v. Alamu, 141 S. Ct. 1364 (2021). While Defendants assert that their actions were justified due to their fear of fentanyl and point out that the record establishes that Plaintiff pled guilty to possessing this dangerous substance at the time of the relevant acts of force at issue, this argument is premature and requires proof of Defendants' training and subjective beliefs, on which the Court declines to speculate at this time.

As to Plaintiff's second claim against this Defendant regarding his use of pepper spray and/or mace on Plaintiff, the individual Defendants' motion to dismiss offers no argument that this Defendant is entitled to qualified immunity for this act, and the Court therefore will not address it.

As to Plaintiff's third claim against this Defendant arising out of his allegation that Defendants performed the strip/cavity search in a manner that forced him to expose his genitals to other officers, nurses, and inmates,[19] the Court finds that this Defendant is not entitled to qualified

---

[18] Notably, this allegation directly contradicts Plaintiff's written grievance, which alleges that the tasing occurred after Plaintiff did not comply with this Defendant's instruction [Doc. 38-2]. Thus, it does not appear that Plaintiff exhausted his available administrative remedies for his claim alleging that Defendant Lt. Smith initially tased him without justification. However, for the reasons set forth above, the Court cannot make this determination at this time.

[19] Again, the Court notes that Plaintiff's written grievance [Doc. 38-2] did not include the relevant facts underlying this claim but finds that it cannot dismiss this claim for the reasons set forth above.

58

immunity, as, in 2013 the Sixth Circuit held that a prisoner had a well-established "'right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others *unless the procedure is reasonably related to a legitimate penological interest.*'" *Stoudemire*, 705 F.3d at 575 (quoting *Farmer v. Perrill,* 288 F.3d 1254, 1260 (10th Cir. 2002)).

While Defendants point out that the strip search in this case was based upon suspicion and thus related to a legitimate penological interest and therefore assert that *Stoudemire* is distinguishable from this case, even if the Court could find that officers conducted the strip search based on particularized suspicion of Plaintiff from the allegations of the amended complaint, the Court finds that the substance of *Stoudemire*'s analysis of "the degree of need for" such searches put a reasonable officer on notice that, even where he has justification for a prisoner strip search, the prisoner has a right to privacy related to that search that the officer may violate by conducting the search in a place that exposes the inmate to others whose presence is not necessary for accomplishment of that search, unless exigent circumstances exist. *Id.* at 573–74. No such exigent circumstances for Defendants to perform the search where others could view Plaintiff are apparent from the allegations of the amended complaint.

As to the rest of Plaintiff's claims against Defendant Lt. Smith, the individual Defendants only allege that they are entitled to qualified immunity on these state law claims to the extent that they are entitled to qualified immunity on Plaintiff's constitutional claims. As the Court has not found that Defendant Lt. Smith is entitled to qualified immunity for Plaintiff's constitutional claims, it will not address this argument.

### ii.     Officer Thomas

Plaintiff's claims against Defendant Officer Thomas arise out of his allegations that this Defendant:

(1)     Violated Plaintiff's rights under the Eighth and Fourteenth Amendment by punching him in the face/head and kneeing him while Plaintiff was on his stomach on the floor and surrounded by officers[20] [Doc. 30 at 29–30];

(2)     Violated Plaintiff's right to privacy under the Fourth and Fourteenth Amendments by forcibly stripping him completely naked to perform a strip/cavity search in a room with a door on "a long, busy hallway where countless people were wandering by and looking on" which was periodically opened and therefore forced "Plaintiff to expose his naked body to innumerable strangers, men and wom[e]n alike" [*Id.* at 34];

(4)     Committed a battery in violation of Tennessee law against Plaintiff by punching him [*Id.* at 49];

(5)     Violated Tennessee law by invading Plaintiff's reasonable expectation of privacy when he stripped Plaintiff naked in a room where officers periodically opened the door in a manner that exposed "Plaintiff's genitals to officers, medical staff, inmates, and others" [*Id.* at 49–50];

(6)     Punched Plaintiff in a manner that amounted to negligence under Tennessee law [*Id.* at 50–52]; and

(7)     Punched Plaintiff in a manner that intentionally inflicted mental anguish on him in violation of Tennessee law [*Id.* at 52–53].

First, Plaintiff's amended complaint alleges that while other officers held him down, this Defendant "punched Plaintiff about the head and/or face multiple times" and that this was "without provocation or purpose" [*Id.* at 31]. Given the at least partially obstructed view of the Body Cam Footage and the disordered nature of the altercation, the Court cannot find that the video footage "blatantly contradicts" these allegations.

Moreover, while the Body Cam Footage shows Plaintiff swatting away the taser probes and punching at the air after the initial tase, those acts occur at approximately 1:27-31 on the video, while Defendant Thomas's punches come at approximately 1:47–54, and while Plaintiff notably admits to telling officers to "cut it out" and to "get off" him during this time, the video does not

---

[20] Again, the Court notes that Plaintiff did not include this claim in his written grievance [Doc. 38-2] but finds that it cannot dismiss this claim for the reasons set forth above.

establish what, if any, physical resistance Plaintiff was exhibiting during the intervening seconds. And while the Body Cam Footage strongly supports this Defendant's assertion that Plaintiff bit his hand during those intervening seconds, it does not "blatantly" establish that such biting occurred, and Plaintiff does not admit to biting this Defendant during this time in his amended complaint.

Thus, Defendant Thomas is not entitled to qualified immunity on this claim at this time. *Hudson v. McMillan*, 503 U.S. 1, 4, 10 (1992) (holding that prisoner's allegation that an officer punched him while another officer restrained him was actionable under the Eighth Amendment). Further, Defendant Thomas is not entitled to qualified immunity on the remainder of Plaintiff's claims for the same reason Defendant Lt. Smith is not.

### iii. Officer Thornbury

While Defendant Officer Thornbury's name is on the individual Defendants' motion to dismiss, the motion sets forth no argument regarding Plaintiff's single claim against this Defendant in his amended complaint. Accordingly, the Court will not address whether Defendant Officer Thornbury is entitled to dismissal based on qualified immunity.

### iv. Officer Bakker

As to Defendant Bakker, Plaintiff alleges that this Defendant:

(1)     Violated Plaintiff's Eighth and Fourteenth Amendment rights when he "drive-stunned Plaintiff with a Taser on his hip and against his bare-skin after Plaintiff had already been repeatedly tased by Lt. Smith, after unarmed Plaintiff, who, at most, was passively resisting orders, had been taken down to the floor by several officers, and [was] surrounded by them" [Doc. 30 at 31];

(2)     Violated Plaintiff's right to privacy under the Fourth and Fourteenth Amendments by forcibly stripping him completely naked to perform a strip/cavity search in a room with a door on "a long, busy hallway where countless people were wandering by and looking on" which was periodically opened and therefore forced "Plaintiff to expose his naked body to innumerable strangers, men and wom[e]n alike" [*Id.* at 34];

61

(4)     Violated Tennessee law by committing a battery against Plaintiff by tasing him [*Id.* at 49];

(5)     Violated Tennessee law by invading Plaintiff's reasonable expectation of privacy when he stripped Plaintiff naked in a room where officers periodically opened the door in a manner that exposed "Plaintiff's genitals to officers, medical staff, inmates, and others" [*Id.* at 49–50];

(6)     Tased Plaintiff in a manner that amounted to negligence under Tennessee law [*Id.* at 50–52]; and

(7)     Tased Plaintiff in a manner that intentionally inflicted mental anguish on Plaintiff in violation of Tennessee law [*Id.* at 52–53].

The Court finds that Defendant Bakker is not entitled to qualified immunity for Plaintiff's claims against him for the same reasons the Court found that Defendant Lt. Smith is not entitled to qualified immunity, as set forth above.

### v.     Lt. Miller

Plaintiff's only claim against Defendant Lt. Miller is that this Defendant violated his Eighth and Fourteenth Amendment rights by telling him that he "might get some eye drops for him and unstrap him from the chair, but that depended on how Plaintiff answered some questions for him," asking him questions about the contraband he had had in his possession, and then leaving him in the restraint chair with his eyes still burning due to the chemical agent for "several hours" before an unidentified officer removed him from the restraint chair and took him to the medical unit, "where [Plaintiff] was given some drops for his still-burning eyes" [*Id.* at 23, 32–33].

As set forth above, the only argument the individual Defendants seem to make regarding this claim in their motion to dismiss is to assert that the video footage they filed shows a nurse providing Plaintiff with eye drops soon after officers strapped him in the restraint chair and Plaintiff did not sue that nurse, and they are not responsible for any medical malpractice on the part of the nurse. However, while the Body Cam Footage appears to strongly suggest that Plaintiff

62

received some eye drops for his eyes soon after he was strapped into the restraint chair, even if the Court assumes that he did, that does not mean that his eyes could not have still been burning, and, liberally construing his allegations in support of this claim in favor of Plaintiff, the Court finds that he adequately alleges that this Defendant left him in a restraint chair for several hours with knowledge that Plaintiff's eyes were burning and that he could not reach them, all while he did not pose any threat to officers, in violation of the Eighth Amendment. *See McCoy v. Alamu*, 141 S. Ct. 1364 (2021).

### D.  Related Discovery Motions and Filings

Defendants filed two motions seeking to quash several notices of deposition that Plaintiff filed and seeking a protective order from discovery pending a ruling on their motions to dismiss [Docs. 58, 68].  Plaintiff filed responses in opposition to these motions [Docs. 59, 71].  As the Court will enter the instant memorandum and order granting in part Defendant Knox County's motion to dismiss and denying the individual Defendants' motion to dismiss, however, these motions [Docs. 58, 68] will be **DENIED as moot**.

Counsel for Plaintiff also filed a joint status report [Doc. 72] noting that, due to Defendants' pending motions for protective order and to quash deposition notices, the parties have been unable to engage in discovery and/or comply with other deadlines in the scheduling order that was applicable at the time of this filing [Doc. 45].  However, as the Court has now entered an amended scheduling order [Doc. 76], it appears that these issues are also moot.

### III.    CONCLUSION

For the reasons set forth above:

> 1.      Defendants' motion for the Court to determine whether to keep video footage of Plaintiff under seal [Doc. 40] is **GRANTED** to the extent the Clerk is **DIRECTED** to keep the Body Cam Footage and video clip from these filings [Doc. 39, Body Cam Footage and Video Clip] under seal.

However, the Clerk is **DIRECTED** to ensure the restraint chair video [Doc. 39, Restraint Chair Video] is not under seal;

2.  Defendant Knox County's motion to dismiss [Doc. 41] is **GRANTED in part** only to the extent that (a) Plaintiff's *Monell* claims against this Defendant arising out of the theories that this Defendant's officers engaged in a pattern of comparable constitutional violations and/or that this Defendant ratified and condoned the acts in the complaint are **DISMISSED** and (b) Plaintiff's state law claims against Defendant Knox County for negligence, intentional infliction of emotional distress, and intentional invasion of privacy are **DISMISSED**;

3.  Defendant Knox County's motion to dismiss [*Id.*] is otherwise **DENIED in part** as to all other claims; and

4.  The individual Defendants' motion to dismiss [Doc. 42] is **DENIED**; and

3.  Defendants' motions to quash deposition notices and for a protection order [Docs. 58 and 68] are **DENIED as moot**.

So ordered.

ENTER:


_____
        s/J. RONNIE GREER
    UNITED STATES DISTRICT JUDGE

64